1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

FISCHER JORDAN LLC,

       Plaintiff,

vs.

DANNY YELLE, an individual, RETAIL CAPITAL LLC d/b/a CREDIBLY, and SEVEN GEOMAX CONSULTING PVT. LTD.,

       Defendants.

Case No. 1:25-cv-10628

**COMPLAINT**

**JURY TRIAL DEMANDED**

**COMPLAINT**

Fischer Jordan LLC ("Plaintiff" or "FJ") brings this action against Danny Yelle ("Yelle"), Retail Capital LLC d/b/a/ Credibly ("Credibly"), and Seven Geomax Consulting Pvt. Ltd. ("Geomax") (collectively, "Defendants") for 1) breach of contract, 2) tortious interference with an existing contract, 3) inducement of breach of contract, and 4) tortious interference with prospective economic relations. Plaintiff hereby alleges as follows:

## PARTIES

1.      Fischer Jordan LLC is a New York limited liability company having its principal place of business in El Segundo, California.

2.      Defendant Retail Capital LLC d/b/a Credibly is a limited liability company formed under the laws of the State of New York with its principal place of business in Southfield, Michigan.

3.      On information and belief, Defendant Seven Geomax Consulting Pvt. Ltd. is a foreign corporation having its principal place of business in India.

4.      Defendant Danny Yelle is an invidual residing in Connecticut.

## JURISDICTION AND VENUE

5.      This court has diversity subject matter jurisdiction over FJ's claims as diversity of citizenship exists between FJ and Defendants.

6.      FJ resides in California. FJ has its headquarters in El Segundo, California.

7.      On information and belief, Geomax is a citizen of India, a foreign state.

8.      On information and belief, Geomax is a manpower and recruitment company.

9.      On information and belief, Yelle is a citizen of Connecticut.

10.     On information and belief, Credibly is a citizen of Michigan and New York.

11.     The amount in controversy exceeds the sum of $75,000.

12.     Jurisdiction is proper under 28 U.S.C. §1332 because the parties are diverse and the amount in controversy exceeds the sum of $75,000.

13.     The Court has personal jurisdiction over Defendants and venue is proper in this District.

**COMPLAINT**

14.     FJ's claims arise out of Defendants' knowing and intentional activities occurring and directed to this District.

15.     Credibly entered into a multi-year business relationship with FJ, which was governed by a Staffing Agency Agreement attached hereto as Exhibit A. The Staffing Agency Agreement provides that "[a]ny disputes arising out of or in connection with this Agreement shall be resolved exclusively in the state or federal courts located in New York, New York."

16.     FJ's claims arise out of the Staffing Agency Agreement, Credibly's breach of the Staffing Agency Agreement and each of Defendants' actions in interfering with and inducing the breach of FJ's contracts with its team members that were providing services to Credibly under the Staffing Agency Agreement.

17.     On information and belief, Yelle is an employee of Credibly.

18.     On information and belief, Geomax is a foreign corporation.

19.     On information and belief, Geomax knowingly and intentionally directed activities that were intended to and did disrupt FJ's business activities, including its contractual relationship with Credibly.

20.     On information and belief, Geomax acted in concert with Credibly and Yelle to interfere with FJ's contractual rights and business activities to the benefit of Credibly and Geomax and at the expense of FJ.

21.     Defendants' acts directed at FJ and its Staffing Agency Agreement with Credibly form a substantial part of the events or omissions giving rise to FJ's claims.

22.     Because the Staffing Agency Agreement has a New York choice of law and New York venue clause, New York has a significant interest in enforcing the the Staffing Agency Agreement and adjudicating the torts arising therefrom. Litigating in New York will be at least as efficient as litigating in another jurisdiction. New York has at least as significant an interest in adjudicating this litigation as any other jurisdiction. Litigating in New York will not be an undue burden on Defendants.

23.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) at least because a substantial portion of the events complained of herein took place in this Judicial District and Defendants are subject to the Court's personal jurisdiction.

**COMMON ALLEGATIONS FOR ALL CLAIMS FOR RELIEF**

24.     FJ is a consulting firm providing its clients analytics, strategy consulting, risk management, digital strategy and other business services.

25.     FJ invests significant resources in recruiting, training, educating, incentivizing, and supporting its consultants. FJ's training and education program spans over a year.

26.     Because of FJ's deep and significant investment in its consultants, FJ's contracts with its team members included non-compete clauses. Further, FJ entered into fixed terms contracts with certain key team members.

27.     Credibly provides loans to U.S. small businesses, including financing, merchant cash advances, and lines of credit.

28.     Credibly and FJ entered into the Staffing Agency Agreement on April 22, 2019 ("Agreement"), which was subsequently amended in 2023. A copy of the Agreement is attached hereto as Exhibit A.

29.     The Agreement was drafted by Credibly.

30.     Under the Agreement, FJ was to "provide to Credibly the services its employees and subcontractors' employees (collectively, 'Assigned Employees') as requested by Credibly in writing." (Exhibit A, ¶1).

31.     The Agreement provides that FJ is "to assume full responsibility for determining Assigned Employees' wages, bonuses, benefits and expense reimbursement; hiring and terminating Assigned Employees; calculating, paying and distributing Assigned Employee paychecks; paying, withholding, and transmitting payroll taxes; all Assigned Employee complaint and discipline; making unemployment contributions; and handling unemployment and workers' compensation claims involving Assigned Employees with respect to compensation that Agency has agreed to pay." (Exhibit A, ¶2).

32.     Further, under the Agreement, FJ is required to "at its sole expense, recruit, interview, test, screen, and ensure compliance with legally required pre-employment obligations for all Assigned Employees to be assigned to Credibly's facilities prior to their assignment at Credibly." (Exhibit A, ¶4).

33.     The Agreement further provides that Credibly has no employment relationship with the Assigned Employees. (Exhibit A, ¶13).

34.     The Agreement further provides that "[n]o provision of this Agreement may be amended or waived unless such amendment or waiver is agreed to in writing signed by the parties." (Exhibit A, ¶23).

35.     Further, the Agreement includes an integration clause that "[t]his Agreement, the exhibits attached hereto, and the provisions on the Agency Timesheet Agreement, contain the entire understanding between the parties hereto, and supersede all prior agreements and understandings relating to the subject matter hereof." (Exhibit A, ¶25).

36.     The Agreement further provides that "in the event that Credibly" hires an Assigned Employee, it will owe FJ certain "Conversion Fees." (Exhibit A, ¶10).

37.     The Agreement includes a confidentiality agreement wherein "Credibly acknowledges that during Agency's performance under this Agreement, Credibly may be given access to or acquire Confidential Information of Agency (as defined below), all of which provides Agency with a competitive advantage and none of which is readily available. Credibly agrees that during the term of this Agreement and any time thereafter it will not use or disclose to any person or company (except under the authority of Agency or if ordered to do so by a Court of competent jurisdiction) any Confidential Information obtained during the term of this Agreement for any reason or purpose. Credibly also agrees that it will use due care and diligence to prevent any unauthorized use or disclosure of such information. As used herein, Agency's 'Confidential Information' means: all information regarding Agency's Assigned and Staff Employees, including but not limited to their names, home addresses, telephone numbers, skills, qualifications, evaluations, availability, record of assignments, and related information."

38.     Under the Agreement, FJ provided Credibly with strategic consulting and analytics resources during a critical time for Credibly when they were experiencing high attrition with low continuity on their analytics team, and subsequently when the COVID pandemic was straining Credibly's capabilities and resources.

39.     Prior to Yelle's arrival at Credibly in the summer of 2021, Credibly had not poached any of FJ's team members and Credibly's relationship with FJ was consistently expanding, with consistent positive feedback from Credibly and FJ staff.

40.     After Yelle's arrival at Credibly, Credibly, Yelle and Geomax collaborated in a scheme to induce FJ's consultants who were providing services to Credibly under the Staffing Agency Agreement to breach their contracts with FJ, sign contracts with Geomax and continue providing services to Credibly at rates lower than those charged by FJ. Defendants did so for the intended purpose of profiting from and taking for themselves the benefits of FJ's heavy investment in its consultants.

41.     Sachin Goel ("Goel") was an FJ team member providing services to Credibly. Goel's contract with FJ included a non-compete clause that prevented him from providing services to FJ's clients, including Credibly, for 18 months after termination of his contract with FJ. Attached hereto as Exhibit B is a copy of Goel's contract with FJ.

42.     On information and belief, in 2021, Yelle induced Sachin Goel ("Goel") to terminate his contract with FJ. Yelle thereafter approached FJ about Credibly hiring hire Sachin Goel ("Goel"), who had been providing services to Credibly through FJ.

43.     FJ objected and specifically raised the issue of Goel's non-compete agreement with FJ.

44.     In early 2022, Credibly sought to hire Archita Bhandari ("Bhandari"), another FJ team member who had also been providing services to Credibly. Attached hereto as Exhibit C is a copy of Bhandari's contract with FJ. Bhandari had also resigned from FJ without warning soon after Yelle's arrival at Credibly.

45.    On January 3, 2022, Bhandari sent Yelle her contract with FJ. The contract itself was FJ confidential information whose disclosure to Yelle constituted a breach of Bhandari's agreement with FJ, which Yelle knowingly induced.

46.    Yelle emailed Credibly's co-CEOs, Edan King and Ryan Rosett regarding Yelle's contract wherein Yelle acknowledged that FJ's contractual rights with Bhandari limited Credibly's ability to hire Bhandari even after she terminated her contract with FJ and proposed that Credibly offer FJ additional consideration to secure the release of Bhandari's contractual obligations to FJ. Credibly's co-CEOs then approved of Yelle's proposal to offer FJ additional money for a release of Bhandari's non-compete clause.

47.    Yelle did not offer this approved money to FJ, but instead assured FJ that if FJ would release Bhandari and Goel from their non-compete obligations, Credibly would increase the amount of work it would send to FJ. This assurance from Yelle was false. Based in material part on Yelle's false representations, FJ agreed to Credibly's hiring of Goel and Bhandari. Contrary to Yelle's representation, Credibly proceded to decrease its engagement with FJ and by 2023 sought to poach every last remaining FJ team member providing services to Credibly.

48.    Neither Credibly nor Yelle disclosed to FJ the existence of Geomax or its role in hiring Bhandari and Goel. Rather, Yelle and Credibly at all times communicated to FJ that Credibly intended to hire Bhandari and Goel as employees of Credibly. Yelle's failure to disclose the existance of Geomax and its role in hiriing Bhandari and Goel was a material omission that Yelle knew or should have known was material to FJ's decision to release Bhandari and Goel's non-compete obligations. Had FJ known that Bhandari and Goel were going to be hired by Gemox, an entity diretly competing with FJ for talent and undercutting FJ's rates after FJ invested significant resources in recruiting and training, FJ would not have agreed to release Bhandari and Goel from their non-compete obligations.

49.    On May 25, 2022, FJ entered into a Services Agreement with Kshitish Krit Nanda ("Nanda"), attached hereto as Exhibit D.

50.    On January 1, 2023, FJ entered into a Services Agreement with Ankush Gupta ("Gupta"), attached hereto as Exhibit E.

51.     These Services Agreements provide that Gupta and Nanda's "Services with the Company [FJ] shall being from the Commencement Date and shall continue for a period of three (3) years or until the Agreement is terminated in accordance with Clause 8 herein below ('Term')." The Services Agreements provided Nanda and Gupta with a signing bonus and retention bonus. The Services Agreements further included non-compete clauses in which Nanda and Gupta agreed not to "render services or advice to any person or entity that is an existing client of" FJ.

52.     On July 31, 2023, Yelle approached FJ about Credibly hiring Nanda and Gupta. On August 1, 2023, FJ responded, stating that Nanda and Gupta were under three-year contracts with FJ that also included non-compete clauses, which precluded Credibly from hiring them.

53.     At this time, Nanda and Gupta were the only two individuals providing services to Credibly through FJ. Thus, by attempting to hire Nanda and Gupta, Yelle was seeking to effectively end Credibly's Agreement with FJ, rather than expand the relationship as he promised in 2021.

54.     FJ presented Credibly with proposals regarding Nanda and Gupta, which Credibly rejected. Credibly did not offer FJ any additional financial consideration in exchange for releasing Nanda and Gupta from their contractual obligations. Credibly insisted that the Agreement granted Crediby an unlimited right to convert Nanda and Gupta into Credibly employees or independent contractors.

55.     Credibly's co- CEO, Edan King, threatened FJ with legal action that would bear a disproportionate cost to FJ if FJ did not consent to Credibly's hiring of Nanda and Gupta.

56.     FJ did not consent to Credibly's hiring of Nanda or Gupta. FJ did not release Nanda or Gupta from any of their obligations to FJ under their respective Services Agreements.

57.     On October 19, 2023, Gupta sent Yelle a copy of his Services Agreement with FJ. Gupta's agreement with FJ was confidential and Gupta's sharing it with Yelle constituted a breach of Gupta's confidentialty obligations to FJ, which Yelle knowingly induced. That same day, Yelle forwarded a copy of Gupta's Services Agreement with FJ to Credibly's co-CEO and General Counsel.

58.     In December 2023, Credibly filed a lawsuit against FJ asking the court to enter a judgment requiring FJ to consent to Credibly's hiring of Nanda and Gupta.

59.     Rather than waiting for the judicial recourse it initiated, in February 2024, Defendants took matters into their own hands and induced Nanda and Gupta to breach their contracts with FJ. In the process, Credibly breached the confidentiality provisions of the Agreement by disclosing to Geomax Nanda and Gupta's identities and providing Geomax their contact information.

60.     Some time between October 2023 and February 2024, Yelle approached Nanda and Gupta asking them if they wanted to work directly for Credibly. On information and belief, Yelle represented to Nanda and Gupta that Credibly's Agreement with FJ granted Credibly the "right" to "convert" Nanda and Gupta into Credibly employees without FJ's consent. As a diret and proximate result of these communications from Yelle, both Nanda and Gupta terminated their contracts with FJ on February 18, 2024 at 9:00 p.m.

61.     On information and belief, Geomax was aware that Nanda and Gupta were under contract with FJ. On information and belief, Geomax had actual and/or constructive knowledge of Nanda and Gupta's Services Agreements with FJ prior to Nanda and Gupta's breach of their contract with FJ. Despite knowing about Nanda and Gupta's contracts with FJ, Geomax sent Nanda and Gupta employement offers and entered into an agreement with Nanda and Gupta on February 17, 2024, through which Nanda and Gupta would provide consulting services to Credibly.

62.     On February 16, 2024, Credibly provided Nanda and Gupta with indemnification agreements with respect to any claims related to their non-competition obligations to FJ.

63.     Credibly dismissed its lawsuit against FJ without prejudice in November 2025.

64.     By inducing Nanda and Gupta to berach their Services Agreements with FJ, Defendants caused FJ significant and irreparable harm.

65.     As a direct and proximate harm of Defendants' tortious conduct and Credibly's breach of contract, FJ has been damaged by an amount no less than $250,000.

66.     As a diret and proximate harm of Defendant's tortious conduct and Credibly's breach of contract, Defendants were unjustly enriched.

**COMPLAINT**

**FIRST CAUSE OF ACTION**

**(Breach of Contract Against Credibly)**

67. Plaintiff hereby realleges and incorporates the above allegations as though fully set forth herein.

68. The Agreement (Exhibit A) is a valid contract between FJ and Credibly.

69. FJ performed its obligations under the Agreement.

70. Credibly breached the Agreement. Specifically, Credibly breached section 17(b) of the Agreement by disclosing to Geomax FJ's confidential information without FJ's consent.

71. In breach of the confidentiality obligations in the Agreement, Credibly disclosed to Geomax the identity, contact information and other FJ confidential information regarding Bhandari, Goel, Nanda and Gupta without FJ's knowledge or consent.

72. Credibly, through its breach of the Agreement, has irreparably injured FJ.

73. FJ has no adequate remedy at law because damages cannot fully be measured, because among other things, the extent of the damage to FJ cannot be fully measured.

74. The balance of equities supports enjoining Credibly.

75. The public interest will be served by the injunction and enforcing FJ's contract rights.

**SECOND CAUSE OF ACTION**

**(Tortious Interference with an Existing Contract Against all Defendants)**

76. Plaintiff hereby realleges and incorporates the above allegations as though fully set forth herein.

77. FJ's agreements with Bhandari and Goel are valid contracts.

78. Yelle, Credibly and Gemoax knew of FJ's agreements with Bhandari and Goel.

79. Yelle persuaded Bhandari to breach her confidentiality obligations with FJ by disclosing her agreement with FJ.

80. Credibly and Yelle communicated with Goel and Bhandari to persuade them to breach their Services Agreement with FJ and enter into agreements with Geomax.

81. Goel and Bhandri breached their non-compete agreements with FJ by entering into agreements with Geomax and providing services to Credibly through Geomax.

82. Defendants knew of Goel and Bhandari's contractual obligations to FJ.

83. Yelle fraudulently induced FJ to consent to Goel and Bhandari providing Credibly services.

84. FJ did not consent to Geomax's hiring of Goel and Bhandari.

85. Yelle, Credibly and Geomax's intentional and improper interference was designed to induce a breach or disruption in FJ's contractual relationships with Goel and Bhandari.

86. Yelle, Credibly and Geomax's intentional and improper interference caused Goel and Bhandari to breach their Services Agreements with FJ.

87. FJ's Services Agreements with Nanda and Gupta are valid contracts.

88. Yelle, Credibly and Geomax knew of FJ's Services Agreements with Nanda and Gupta.

89. Yelle, Credibly and Geomax communicated with Nanda and Gupta to persuade them to terminate their Services Agreement with FJ and enter into agreements with Geomax.

90. Yelle's communications with Nanda and Gupta persuading them to terminate their contract with FJ and to sign contracts with Geomax interfered with FJ's contractual rights with Nanda and Gupta, including the fixed term of the Services Agreement and non-compete clause therein.

91. Credibly's engagement of Geomax to utilize the services of Nanda and Gupta interefered with FJ's contractual rights with Nanda and Gupta, including the fixed term of the Services Agreement and non-compete clause therein.

92. Geomax's communications and offers to Nanda and Gupta interered with FJ's contractual rights with Nanda and Gupta, including the fixed term of the Services Agreement and non-compete clause therein.

93. Yelle, Credibly and Geomax's intentional and improper interference was designed to induce a breach or disruption in FJ's contractual relationships with Nanda and Gupta.

94. Yelle, Credibly and Geomax's intentional and improper interference caused Nanda and Gupta to breach their Services Agreements with FJ.

95. Defendants, through their interference, have irreparably injured FJ.

96. FJ has no adequate remedy at law because damages cannot fully be measured, because among other things, the extent of the damage to FJ cannot be fully measured.

97. The balance of equities supports enjoining Defendants.

98. The public interest will be served by the injunction and enforcing FJ's contract rights.

## **THIRD CAUSE OF ACTION**

### **(Inducement to Breach of Contract against all Defendants)**

99. Plaintiff hereby realleges and incorporates the above allegations as though fully set forth herein.

100. FJ's agreements with Bhandari and Goel are valid contracts.

101. Yelle, Credibly and Gemoax knew of FJ's agreements with Bhandari and Goel.

102. Yelle persuaded Bhandari to breach her confidentiality obligations with FJ by disclosing her agreement with FJ.

103. Credibly and Yelle communicated with Goel and Bhandari to persuade them to breach their Services Agreement with FJ and enter into agreements with Geomax.

104. Goel and Bhandri breached their non-compete agreements with FJ by entering into agreements with Geomax and providing services to Credibly through Geomax.

105. Defendants knew of Goel and Bhandari's contractual obligations to FJ.

106. Yelle fraudulently induced FJ to consent to Goel and Bhandari providing Credibly services.

107. FJ did not consent to Geomax's hiring of Goel and Bhandari.

108. Yelle, Credibly and Geomax's intentional and improper interference was designed to induce a breach of FJ's contracts Goel and Bhandari.

109. Yelle, Credibly and Geomax's intentional and improper actions knowingly induced Goel and Bhandari to breach their agreements with FJ.

110. FJ's Services Agreements with Nanda and Gupta are valid contracts.

111. Yelle, Credibly and Geomax knew of FJ's Services Agreements with Nanda and Gupta.

112.    Yelle, Credibly and Geomax communicated with Nanda and Gupta to persuade them to terminate their Services Agreement with FJ and enter into agreements with Geomax.

113.    Yelle's communications with Nanda and Gupta persuading them to terminate their contract with FJ and to sign contracts with Geomax were designed to induce a breach in FJ's contractual relationships with Nanda and Gupta.

114.    Credibly's engagement of Geomax to utilize the services of Nanda and Gupta were designed to induce a breach in FJ's contractual rights with Nanda and Gupta.

115.    Geomax's communications and offers to Nanda and Gupta were designed to induce a breach in FJ's contractual rights with Nanda and Gupta.

116.    Yelle, Credibly and Geomax's intentional and improper acts were designed to induce a breach in FJ's contractual rights with Nanda and Gupta.

117.    Defendants, through their inducement of Goe, Bhandari, Nanda and Gupta's breach of their Services Agreements with FJ, have irreparably injured FJ.

118.    FJ has no adequate remedy at law because damages cannot fully be measured, because among other things, the extent of the damage to FJ cannot be fully measured.

119.    The balance of equities supports enjoining Defendants.

120.    The public interest will be served by the injunction and enforcing FJ's contract rights.

### FOURTH CAUSE OF ACTION

**(Tortious Interference with Prospective Economic Relations Against all Defendants)**

121.    Plaintiff hereby incorporates the above allegations as though fully set forth herein.

122.    Pursuant to the Services Agreements, FJ was in an economic relationship with Nanda and Gupta that would have resulted in an economic benefit to FJ.

123.    Yelle, Credibly and Geomax knew of the relantionship between FJ and Nanda and FJ and Gupta.

124.    The relationship between FJ and Nanda and FJ's rights under the Services Agreement provide FJ with an economic benefit.

125.    The relationship between FJ and Gupta and FJ's rights under the Services Agreement provide FJ with an economic benefit.

126.    Yelle, Credibly and Geomax misappropriated FJ's confidential information to induce Nanda and Gupta to terminate their relationship with FJ.

127.    Credibly's misappropriation of FJ confidential information also constitutes a breach of Credibly's Agreement with FJ.

128.    Yelle, Credibly and Geomax engaged in such conduct knowing that disruption of the relationship between FJ and Nanda and Gupta was certain, or substantially certain, to occur.

129.    As a direct result of Yelle, Credibly and Geomax's conduct, the relationship between FJ and Nanda and Gupta has been disrupted, thereby causing harm to FJ in the form of lost revenue and profits, loss of a substantial portion of its talent pool, and dimishment of FJ's operations in India.

130.    FJ has no adequate remedy at law because damages cannot fully be measured.

131.    The balance of equities supports enjoining Defendants.

132.    The public interest will be served by the injunction and enforcing FJ's contract rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor against Defendants for the following relief:

A.    That the Court enter injunctive relief in favor of FJ and against Defendants for all claims for relief alleged herein;

B.    That the Court render a final judgment in favor of FJ and against Defendants on all claims for relief alleged herein;

C.    That the Court render a final judgment that Credibly is liable for breach of contract by breaching the Agreement with FJ by disclosing FJ confidential information to Geomax;

D.    That the Court enter a final judgment that Yelle, Credibly and Geomax are liable for tortiously interfering with an existing contract by inducing Nanda and Gupta to breach their Services Agreements with FJ by terminating those Services Agreements before the expiration of the fixed term and by violating the non-compete and confidentiality provisions of those agreements;

E.      That the Court enter a final judgment that Yelle, Credibly and Geomax are liable for inducing Nanda and Gupta to breach their Services Agreements with FJ by terminating those Services Agreements before the expiration of the fixed term and by violating the non-compete and confidentiality provisions of those agreements;

F.      That the Court enter a final judgment that Yelle, Credibly and Geomax are liable for tortiously interfering with FJ's prospective economic relations with Nanda and Gupta;

G.      That Credibly, its agents, servants, employees, attorneys, successors and assigns, and all other persons in active concert or participation with any of them who receive actual notice of the injunction by personal service or otherwise, be fortwith enjoined from engaging the services of Nanda and Gupta.

H.      That Geomax, its agents, servants, employees, attorneys, successors and assigns, and all other persons in active concert or participation with any of them who receive actual notice of the injunction by personal service or otherwise, be fortwith enjoined from engaging the services of Nanda and Gupta.

I.      That Defendants be required to account to FJ for any and all gains, profits, and advantages derived by them, and all damages sustained by FJ, by reason of Defendants' acts complained herein;

J.      That FJ be awarded compensatory and consequential damages;

K.      That FJ be awarded punitive damages;

L.      That FJ be awarded attorneys' fees;

M.      That FJ be awarded taxable costs; and

N.      That FJ be awarded such other and further relief as the Court may deem just.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Fischer Jordan, LLC hereby demands a trial by jury on all issues so triable.

Dated: December 22, 2025          Respectfully submitted,


                                  By: /s/ Omer Salik

                                  **CARTER ARNETT PLLC**
                                  Omer Salik (NY Bar No. 6249783)
                                  8150 N Central Expy, Suite 500
                                  Dallas, TX 75206
                                  Telephone: 214-550-8183
                                  osalik@carterarnett.com

                                  *Counsel for Plaintiff*

**COMPLAINT**

# Exhibit A

V2.0

## ℀ CREDIBLY

### STAFFING AGENCY AGREEMENT

This Staffing Agency Agreement (this "**Agreement**"), dated as of April 22, 2019 (the "**Effective Date**") is made by and between, [Fischer Jordan LLC], a New York limited liability company ("**Agency**"), and Retail Capital LLC dba Credibly, an New York limited liability company (on behalf of itself and its affiliates, "**Credibly**").

<u>RECITALS</u>

   A. Agency is engaged in the business of assigning its employees as contractors to perform services for companies, and providing related management and human resource services.

   B. Credibly desires to engage Agency on a non-exclusive basis to provide such services as may be necessary to meet Credibly's staffing needs.

<u>TERMS</u>

Duties of Agency

1. **Agency Services**. Agency shall provide to Credibly the services of its employees and subcontractors' employees (collectively, "**Assigned Employees**") as requested by Credibly in writing. Agency shall provide initial Assigned Employees for the job titles set forth on <u>Exhibit A</u> or such other Statement of Work signed by the parties (each, a "**Work Order**"). Agency shall manage the provision of services to Credibly in accordance with the provisions of this Agreement. All services provided to Credibly by Agency and Assigned Employees shall be performed to Credibly's satisfaction in a timely and professional manner.

2. **Responsibilities of Agency**. Agency agrees to assume full responsibility for determining Assigned Employees' wages, bonuses, benefits and expense reimbursement; hiring and terminating Assigned Employees; calculating, paying and distributing Assigned Employee paychecks; paying, withholding, and transmitting payroll taxes; all Assigned Employee complaint and discipline; making unemployment contributions; and handling unemployment and workers' compensation claims involving Assigned Employees with respect to compensation that Agency has agreed to pay. Assigned Employees shall not be entitled to holidays, vacations, disability, insurance, pensions or retirement plans, or any other benefits offered or provided by Credibly to its direct employees. Agency shall require all Assigned Employees to sign an agreement, attached as <u>Exhibit B</u>, prior to their assignment to acknowledge their understanding that they are not entitled to Credibly benefits offered to its direct employees and waive any right that may be deemed to exist or that may come into existence with respect to such benefits.

3. **Subcontractors.** Agency may use subcontractors' employees on a limited, supplementary basis for the services provided under this Agreement; provided, however, Agency shall (i)

1

V2.0

enter into a written agreement with each subcontractor prior to utilizing such subcontractor's employees which includes, at a minimum, the requirements set forth in this Agreement; (ii) provide Credibly with the names and addresses of all subcontractors; and (iii) remain responsible for all actions and omissions of subcontractors and their employees and their compliance with the terms of this Agreement.

4. **Pre-Employment Obligations**. Agency shall, at its sole expense, recruit, interview, test, screen, and ensure compliance with legally required pre-employment obligations for all Assigned Employees to be assigned to Credibly's facilities prior to their assignment at Credibly.

5. **Background Checks**. Agency shall, at its sole expense, perform the following pre-employment background checks for all Assigned Employees: (a) criminal conviction record (for all states of residence listed by Assigned Employee and for the maximum historical period permissible by such states) and (b) credit record. Agency shall not assign any employee to Credibly who (x) has been convicted of (i) a felony or (ii) any misdemeanor involving violence, sexually related criminal conduct, theft or computer crimes, fraud or financial crimes, or crimes involving unlawful possession or use of a dangerous weapon; or (y) is identified on any government registry as a sex offender. The failure of Agency to comply with the requirements of this section shall be considered a material breach of this Agreement.

6. **Reports**. Agency shall prepare and deliver reports as may be reasonably requested by Credibly.

7. **System Access**. If applicable, Credibly agrees that all timecards will be processed through Agency's system and Credibly will register and use such system. Throughout the term of this Agreement, Agency shall provide Credibly with access to the Agency system.

Duties of Credibly

8. **Payment for Services**.

   a. Agency will invoice Credibly for services provided in accordance with this Agreement on a weekly basis (Monday through Sunday) in arrears. Payment shall be due within thirty (30) days of receipt of the invoice. Agency's bill rates by job categories are set forth in the applicable Work Order.

   b. In the event a portion of any invoice is disputed, the undisputed portion shall be paid. In the event the agreed-upon resolution of the dispute includes a debit or credit to either party, such debit or credit shall be effected as an adjustment on the invoice for the next available period. Neither party shall have the right to dispute any invoice more than 180 days after receipt by Credibly.

   c. In the event an Assigned Employee works more than forty (40) hours in any work week for Credibly and such overtime was at the written request of Credibly, such Assigned Employee shall be entitled to overtime compensation as provided by law and Credibly agrees to an increase in the bill rate to reflect such additional compensation plus applicable markup.

9. **Government Contract**. Credibly agrees to notify Agency immediately whenever any Assigned Employee performs any work under a Government Contract, and agrees to pay

V2.0

to Agency a price differential to reflect the higher wages that may be due any such employee by reason of any Government Contract law or contract specifications.

10. **Conversion Fees**. In the event that Credibly hires or engages as an independent contractor any Assigned Employee during the term of the Agreement, Credibly shall notify Agency and upon the Agency' written request Credibly shall pay to Agency a conversion fee for such Assigned Employee calculated as follows:

| Assigned Employee Period | Conversion Fee Percentage |
|---|---|
| 0-6 months assigned to Credibly | 60% |
| 6-24 months assigned to Credibly | 40% |
| >24 months assigned to Credibly | 20% |

The conversion fee is determined by multiplying the conversion fee percentage set forth above times the annualized base salary for the Assigned Employee, not including any bonuses, incentives, commissions or benefits of any kind.

11. **Limitations**.

a. Credibly will not request or permit any Assigned Employee to use any vehicle, regardless of ownership, in connection with the performance of services for Credibly.

12. **Guarantee of Rates**. Agency guarantees the bill rates as set forth in the applicable Work Order through the term of the Agreement, subject to an increase in payroll taxes which may be passed through on a dollar-for-dollar basis.

13. **Independent Contractor**. The services which Agency and its employees shall render under this Agreement shall be as an independent contractor with respect to each other and to Credibly. Nothing contained in this Agreement shall be construed to create the relationship of principal and agent, or employer and employee, between Agency or its employees and Credibly. Agency shall have ultimate responsibility and authority to hire and terminate all Assigned Employees; provided, however, Credibly shall have the right to reject any Assigned Employee for any lawful reason. Credibly does not have an employment relationship with the Assigned Employees and therefore shall not have the right to terminate or suspend the Assigned Employees

14. **Workers' Compensation and Employers Liability Insurance**.

a. Agency shall provide and maintain workers' compensation insurance coverage for Assigned Employees in accordance with applicable state law. The parties agree to immediately notify each other of any injury or accidents or any claim for workers' compensation benefits involving Assigned Employees assigned to Credibly's facility.

b. Agency shall provide and maintain employer liability Insurance with limits of at least: $500,000 for Bodily Injury – each accident
$500,000 for Bodily Injury by disease – policy limits
$500,000 for Bodily Injury by disease – each employee

c. Agency shall ensure that all subcontractors provide and maintain no less than the same insurance policies set forth above.

V2.0

d. To the fullest extent allowable by law, the foregoing policies must include a waiver of subrogation in favor of Credibly and its directors, officers and employees, except for claims due to the negligence or willful misconduct of Credibly.

15. **Regulatory Compliance**.

a. OSHA Compliance. To the extent an Assigned Employee provides his or her services from a party's facilities, such party shall be deemed to control such facilities and shall be responsible for compliance with the Occupational Safety and Health Act and comparable state laws and regulations thereunder, as applicable.

b. EEO Compliance. Credibly and Agency affirm and agree that they are equal employment opportunity employers and are in full compliance with any and all applicable anti-discrimination laws, rules, and regulations. Credibly and Agency agree not to harass, discriminate against, or retaliate against any employee of the other because of his or her race, national origin, age, sex, religion, disability, marital status, or other category protected by law; nor shall either party cause or request the other party to engage in such discrimination, harassment, or retaliation. In the event of any complaint of unlawful discrimination, harassment, or retaliation by any Assigned Employee, Credibly and Agency agree to cooperate in the prompt investigation and resolution of such complaint.

c. FMLA and OFLA Compliance. Credibly and Agency agree that for purposes of all statutory and regulatory requirements for employee leaves of absence, Credibly and Agency shall cooperate in compliance with any such requirements.

16. **Right to Audit**. Upon written notice to Agency, Credibly may inspect Agency's records to verify Agency's compliance with this Agreement.

17. **Confidentiality**.

a. Credibly's Confidential Information. Agency acknowledges that it or its Assigned Employees may be given access to or acquire information which is proprietary to or confidential to Credibly or its affiliated companies and their clients and customers. Any and all such information obtained by Agency shall be deemed to be confidential and proprietary information. Agency agrees to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purposes whatsoever other than the providing of services to Credibly. Agency agrees to direct Assigned Employees to keep such information confidential, and to require Assigned Employees to enter into Confidentiality Agreements in the form annexed hereto as Exhibit C before being assigned to Credibly.

b. Agency's Confidential Information. Credibly acknowledges that during Agency's performance under this Agreement, Credibly may be given access to or acquire Confidential Information of Agency (as defined below), all of which provides Agency with a competitive advantage and none of which is readily available. Credibly agrees that during the term of this Agreement and any time thereafter it will not use or disclose to any person or company (except under the authority of Agency or if ordered to do so by a Court of competent jurisdiction) any

4

V2.0

Confidential Information obtained during the term of this Agreement for any reason or purpose. Credibly also agrees that it will use due care and diligence to prevent any unauthorized use or disclosure of such information. As used herein, Agency's "Confidential Information" means: all information regarding Agency's Assigned and Staff Employees, including but not limited to their names, home addresses, telephone numbers, skills, qualifications, evaluations, availability, record of assignments, and related information.

18. **Assignment of Intellectual Property**. Any and all discoveries and/or inventions (which shall include improvements and modifications) relating to work performed by Assigned Employees, or relating to matters disclosed to Assigned Employees in connection with work to be performed, or suggested by such matters, whether or not patentable, which discoveries and/or inventions are made or conceived by Assigned Employees, solely or jointly with others, during the term of any assignment (regardless of whether conceived or developed during working hours) or during a period of one (1) year thereafter, shall be the property of Credibly as "work made for hire" to the extent provided by sections 101 and 201(b) of the Copyright Act, 17 U.S.C. 101 *et seq.*, and such discoveries and/or inventions shall be promptly disclosed to Credibly. Credibly shall have the right to file and prosecute, at its own expense, all patent applications, whether U.S. or foreign, on said discoveries and/or inventions. Assigned Employees shall, during any assignment with Credibly or any time thereafter, provide to Credibly all documents, information, and assistance requested for the filing or prosecution of any such patent application, for the preparation, prosecution, or defense of any legal action or application pertaining to such discoveries and/or inventions and for the assignment or conveyance to Credibly of all right, title, and interest in and to such discoveries and/or inventions, patent applications, and letters patent issuing thereon. All Assigned Employees shall sign an agreement, attached hereto as <u>Exhibit D</u>, confirming the provisions contained in this paragraph 30.

19. **Cooperation**. The parties agree to cooperate fully and to provide assistance to the other party in the investigation and resolution of any complaints, claims, actions, or proceedings which may be brought by or involve any of the Assigned Employees.

20. **Term and Termination**.

   a. This Agreement shall be for an initial term of one (1) year from the Effective Date. In the event there are active Assigned Employees as of the expiration of the initial term, this Agreement shall be automatically continue on a month-to-month basis for the duration of such Assigned Employees unless modified or terminated in accordance with the provisions of this Agreement.

   b. Credibly may terminate any services provided by an Assigned Employee upon written notice. If such termination of services is within fifteen days of the Assigned Employee's commencement of services and is due to the quality of services provided by such Assigned Employee, Agency will refund the fees paid for such Assigned Employee.

   c. This Agreement may be terminated by either party for material breach immediately upon notice and for convenience upon 30 days' written notice with no further liability other than for liabilities which accrued and services rendered up to the date of termination.

5

V2.0

d. Notwithstanding any other provision of this Agreement, in the event the other party declares bankruptcy or insolvency or becomes bankrupt or insolvent, dissolves or discontinues operations, or fails to make any payments within the time periods specified in this Agreement, either party may terminate this agreement immediately upon written notice without further liability for any kind other than for services rendered up to the date of termination.

e. Notwithstanding any other provision of this Agreement, if Credibly terminates this Agreement or notifies Agency of its intent to terminate this Agreement, and Credibly desires to have all or some of the Assigned Employees continue to work at Credibly's facilities, Credibly shall notify Agency of the foregoing no less than five days prior to the date it intends to terminate the Agreement and pay Agency the applicable early conversion fee based on the calculation set forth in Section 10 for each Assigned Employee who is transferred to or placed on the payroll of any other firm or person and who continues to perform services for Credibly or at Credibly's facility.

MISCELLANEOUS

21. **Survival of Certain Provisions**.  Those provisions of this Agreement which by their terms extend beyond the termination or non-renewal of this Agreement shall remain in full force and effect and survive such termination or non-renewal.

22. **Notice**.  Such notice shall be personally delivered or sent by recognized overnight courier or by certified mail, return receipt requested, and shall be effective when received as follows:

To Agency:

Fischer Jordan LLC
125 Maiden Lane, Suite 307
New York, NY 10038

To Credibly:

Retail Capital LLC dba Credibly
1250 Kirts Blvd, Suite 100
Troy, MI 48170
Attn: Human Resources

With copy to:
Attn: Legal Department

Either party may designate a different or additional recipient or address by notifying the other party in writing in accordance with this Agreement.

23. **Amendments**.  No provision of this Agreement may be amended or waived unless such amendment or waiver is agreed to in writing signed by the parties.

24. **Severability**.  Each provision of this Agreement shall be considered severable such that if any one provision or clause conflicts with existing or future applicable law, or may not be given full effect because of such law, this shall not affect any other provision which can be given effect without the conflicting provision or clause.

25. **Complete Agreement**. This Agreement, the exhibits attached hereto, and the provisions on the Agency Timesheet Agreement, contain the entire understanding between the

V2.0

parties hereto, and supersede all prior agreements and understandings relating to the subject matter hereof.

26. **Successors and Assigns**. The provisions of this Agreement shall inure to the benefit of and be binding upon the parties and their respective permitted representatives, successors, and assigns.

27. **Headings**. The headings of the paragraphs of this Agreement are inserted solely for the convenience of reference. They shall in no way define, limit, extend, or aid in the construction of the scope, extent, or intent of this Agreement.

28. **Waiver**. The failure of a party to enforce the provisions of this Agreement shall not be construed as a waiver of any provision or the right of such party thereafter to enforce each and every provision of this Agreement.

29. **Transferability**. Agency shall not transfer or assign this Agreement without the written consent of Credibly. For purposes of this Agreement, a change in control of Agency shall be considered an assignment.

30. **Ambiguities**. The rule of construction that ambiguities in an agreement are to be construed against the drafter shall not be invoked or applied in any dispute regarding the meaning or interpretation of any provision of this Agreement.

31. **Indemnification**. To the extent permitted by law, and except for claims, losses, and liabilities expressly disclaimed by Agency in this Agreement, Agency agrees to defend, indemnify, and hold Credibly harmless of and from any and all claims or losses that Credibly actually incurs (including reasonable attorneys' fees) proximately caused by the fault, negligence, gross negligence, or recklessness of Agency, or its subcontractors, officers, employees or authorized agents, or which arise from Agency's breach of this Agreement.

32. **Disclaimer of Agency Liability**. Other than due to Agency's fraud, willful misconduct or failure to comply with its obligations under Section 5 this Agreement, Agency expressly disclaims liability for any claim, loss, or liability of any kind whatsoever resulting from:

    a. Credibly's failure to reasonably supervise, control, or safeguard premises, processes, or systems; or, without Agency's Agency prior written approval, entrusting Assigned Employees with unattended premises, cash, checks, keys, credit cards, merchandise, confidential or trade secret information, negotiable instruments, or other valuables. Agency acknowledges that, in the course of Assigned Employees' normal duties for Credibly, all Assigned Employees may come into contact with personal identifying information, credit card, debit card and bank account information and may participate in certain proprietary processes. Agency gives its consent to such contact and agrees that all such information shall be considered Credibly Confidential Information.

    b. Credibly requesting or permitting Assigned Employees to use any vehicle, regardless of ownership, in connection with the performance of services for Credibly unless Agency has given its Agency prior approval in writing.

    c. Promises of increased compensation made by Credibly to Assigned Employees.

V2.0

    d. Claims by any person relating to any Credibly product or service unrelated to the performance of the Assigned Employees.

    e. Credibly's making substantial changes in the Assigned Employee's job duties without Agency's prior written approval.

    f. The negligent conduct of Credibly's officers, employees, and agents.

    g. Failure by Credibly to provide Assigned Employees with a safe worksite or to provide information, training, and safety equipment with respect to any hazardous substances or conditions to which they may be exposed at the worksite, whether or not required by law.

33. **Limitation of Liability.** In no event will either party be liable for indirect, incidental, special or consequential damages in connection with this Agreement or the services provided hereunder; provided, however, the foregoing limitation shall not apply to indemnification obligations of Agency or its fraudulent or willful misconduct.

34. **Choice of Law; Jurisdiction**. This agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to any conflicts of law principles thereof.  Any disputes arising out of or in connection with this Agreement shall be resolved exclusively in the state or federal courts located in New York, New York.

[Signature page follows.]

V2.0

IN WITNESS WHEREOF, this Agreement has been duly executed by Agency and Credibly on the dates set forth below.

**Retail Capital LLC dba Credibly**          **Fischer Jordan LLC**


_____                      _____
Signature                                    Signature

                                             Boaz  Salik
_____                      _____
Printed Name                                 Printed Name

                                             CEO
_____                      _____
Title                                        Title

                                             4/22/19
_____                      _____
Date                                         Date

9

V2.0

## EXHIBIT A – Sample Work Order

**Assigned Employees:** Sachin Goel

| Job Title | Agency Bill Rate |
|-----------|------------------|
| Consultant | $100 per hour |
| | $ |
| | $ |
| | $ |

**Other Terms:**

**Signatures**

**Retail Capital LLC dba Credibly**          Agency: _____

By: _____              By: _____
Name: _____              Name: _____
Title: _____              Title: _____
Date: _____              Date: _____

## AMENDMENT #1 TO STAFFING AGENCY AGREEMENT

This Amendment #1 to Staffing Agency Agreement (this "<u>Amendment</u>") dated as of February 16, 2023 (the "<u>Amendment Effective Date</u>") by and between Fischer Jordan LLC ("<u>Agency</u>"), and Retail Capital LLC dba Credibly ("<u>Credibly</u>") and amends the Staffing Agency Agreement, dated April 22, 2019, between the parties.  Capitalized terms not defined in this Amendment have the respective meanings set forth in the Agreement.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Agreement as follows:

1.  A new Section 35 is added to the Agreement:

35.  **Non-Competition.**  Agency covenants and agrees that:

(i) no Assigned Employees, while employed by Agency, will provide services to any Credibly direct competitor during the period such Assigned Employees are providing services to Credibly and continuing for a period of 9 months thereafter;

(ii) to the extent permitted by applicable law and as a condition of Assigned Employees' assignment to provide services (or continue to provide services) to Credibly, Agency shall also require such Assigned Employees to sign a covenant that, upon their separation from employment from Agency for any reason, they shall not provide services to any Credibly direct competitor for a period of 9 months after providing services to Credibly; provided, however, the  covenant in this subsection (ii) shall <u>not</u> apply if Credibly terminates the Staffing Agency Agreement and/or such Assigned Employee's engagement for convenience (without cause);

 (ii) Agency will continue to implement its Firewall Policy, including paragraphs 6 and 7 of that policy;

(iii) Agency shall remind Assigned Employees of their obligations regarding Credibly confidential information and any applicable non-compete provisions upon the termination of their employment with Agency; and

(iv) Agency shall not permit any "training" or "shadowing" employees (for purposes of clarity, employees other than Assigned Employees) to have access to material Confidential Information, including, but limited to, by attending or watching telephone or video conference calls, review of or assistance with works-in-progress or deliverables, or otherwise.

For purposes of clarity, the foregoing shall not be interpreted to limit Agency's or its Assigned Employees' obligations or Credibly's rights under Sections 17(a) and Section 18 of the Agreement.  This Section 35 will survive any termination of the Agreement.

1.  This Amendment is made a part of and subject to the Agreement.  Except as expressly set forth in this Amendment, the terms of the Agreement remain in full force and effect.

[Signature page follows.]

The parties have executed this Amendment #1 to Services Agreement as of the Amendment Effective Date first written above.


**RETAIL CAPITAL LLC DBA CREDIBLY**

By: _Dan Yelle_
Dan Yelle (Feb 22, 2023 10:11 EST)
_____

Print Name: Dan Yelle

Title: Chief Data and Analytics Officer


**FISCHER JORDAN LLC**

By: _Boaz Salik_
Boaz Salik (Feb 22, 2023 09:41 EST)
_____

Print Name: Boaz Salik

Title: Chief Executive Officer

Exhibit B

## SERVICES AGREEMENT

The **Services Agreement** ("**Agreement**") is made on the 7th day of April, 2019 and effective from April 10, 2019 by and between:

**FischerJordan LLC**, a company incorporated under the laws of the state of New York and having its registered office at 125 Maiden Lane, Suite 307, New York, NY 10038, USA (hereinafter referred to as the "**Company**" which expression shall unless repugnant to the meaning or context thereof, be deemed to mean and include its successors and permitted assigns) of the **FIRST PART**

**AND**

**Mr. Sachin Goel**, an adult Indian citizen presently residing at "7 Walmer Road, Toronto, ON M5R 2W8" (hereinafter referred to as "**the Service Provider**" which expression shall unless repugnant to the meaning or context thereof be deemed to mean and include her/his heirs, administrators, executors and legal representatives) of the **SECOND PART**

The Company and the Service Provider are collectively referred to as "**Parties**" and individually as "**Party**"

**WHEREAS**

A.    The Company is engaged *inter alia* in the business of management consultancy

B.    The Company now wishes to appoint the Service Provider to render certain services to the Company on the terms and conditions hereinafter appearing.

C.    In consideration of the mutual promises and agreements between the Parties hereto, the Parties have agreed to enter into this Agreement to govern the terms and conditions of Services.

**NOW THEEFORE IT IS HEREBY AGREED BY AND AMONGST THE PARTIES AS UNDER**:

1.    **APPOINTMENT AND TERM**

1.1   The Company has appointed the Service Provider on and from April 10, 2019 (*"***Commencement date***")* on a 6 (six) month probationary basis ("**Probationary Period**") in accordance with the terms and conditions of this Services Agreement.

1.2   During the Probationary Period the Service Provider shall be provided with guidance, training and feedback from the Company on the performance of the Service Provider. During the continuance of the Probationary Period, the Company shall at its sole discretion, be at liberty to terminate the Services of the Service

1

Provider in the event that the Service Provider fails to fulfill his/her obligations as provided for in this Agreement.

1.3   Prior to and during the Probationary Period the Company shall carry out such reference checks, verification of educational and other documents/certificates and medical examinations with respect to the Service Provider, as the Company may deem necessary and appropriate. In the event that the Company is satisfied by the results of the above as well as the performance of the Service Provider during the Probationary Period, the Company shall confirm the Services of the Service Provider in writing and from thereon the Service Provider shall be deemed to be a full-time Service Provider of the Company.

1.4   The Service Provider's Services with the Company shall continue till such time as the Agreement is terminated in accordance with Clause 8 herein below (**"Term"**).

2.   **SERVICES CONDITIONS**

2.1   The Service Provider shall fulfill such general duties and responsibilities as are assigned to him/her from time to time by the Board of Directors of the Company (**"Board"**)/senior management of the Company.

2.2   The Service Provider shall devote all of his/her business time, attention and energies to rendering the Services to the Company, and shall assume and perform such further reasonable responsibilities and duties as may be assigned or directed by the Board/senior management of the Company.

2.3   The Service Provider agrees that he/she will at all times while performing services for the Company, devote his/her best efforts, skill and ability and shall perform his/her responsibilities as a Service Provider of the Company in a competent ethical and professional manner.

2.4   The Service Provider agrees to abide by the rules, regulations, instructions, personnel policies and the policies of the Company and any change thereof, which may be adopted by the Company and intimated to the Service Provider from time to time.

2.5   The Service Provider's place of work shall be Mumbai, but he/she may be required to travel to any place within or outside India as directed by the Company, from time to time. All/any such travel shall be in accordance with the travel policy of the Company as maybe amended from time to time.

2.6   The Service Provider shall dedicate a minimum of 240 days per calendar year to rendering the Services to the Company.

2.7   The Company reserves the right to transfer the services of the Service Provider to any another department within the Company or to any other location or assign

his/her Services to one of its affiliate entities on the same terms and conditions as this Agreement and the Service Provider hereby undertakes to have no objection to the same.

3.    **FEES & TAXES**

3.1    In consideration of the Services to be rendered by the Service Provider to the Company, the Company shall pay to the Service Provider a sum of **Rs. ▮▮▮▮▮▮▮▮ (Rupees Eighteen lakhs only) per annum**.

3.2    The consideration payable hereunder shall be paid on a monthly basis (in equal installments) on or before the 5th business day of the following month.

3.3    Intentionally left blank

3.4    Payments outlined in sections 3.1 will be conditional on completion of the services until the payment date, in their entirety, under the terms of this Agreement, and with neither party having served notice of termination of the agreement to the other party as of the payment date

3.5    All amounts payable to the Service Provider by the Company pursuant to his/her Services shall be subject to requisite tax and other statutory deductions in accordance with applicable laws.

3.6    Reimbursement of expenses: It is expressly agreed by the Parties that the Service Provider shall be entitled to reimbursement for such out of pocket expenses reasonably incurred by the Service Provider in the course of his Services including but not limited to travel, boarding and lodging which shall be reimbursed in accordance with the prevailing reimbursement policy of the Company, as maybe amended from time to time.  Provider must obtain the prior written approval of a Company Principal for any expenses over $100.

4.    **REPRESENTATIONS AND WARRANTIES**

4.1    The Service Provider hereby represents warrants and undertakes that:

    (a)    The execution of the Agreement by him/her with the Company will not result in breach of any terms and conditions of any agreements or arrangements or infringe any statutory, contractual or other rights of any third parties, or constitute default under the laws of India or violate any rule, regulation or law of any government or any order, judgment or decree of any court or government body;

    (b)    The Service Provider shall discharge the duties assigned to him/her in the course of his/her Services with greatest sincerity and diligence and shall at

all times exercise his/her best efforts to protect and further the Company's interests;

(c) The Service Provider shall at all times during the subsistence of his/her Services, act in compliance with all applicable rules, regulations and policies of the Company and shall not indulge in any unethical behavior; and

(d) The Service Provider has not been convicted of any offence by any court of law and is not a party to any proceedings pending before or likely to be initiated before or by any court, tribunal, government agency or similar statutory body.

(e) The Service Provider does not have any conflict of interest arising from an independent relationship with suppliers, customers and other outside individuals and organizations associated with the Company, which could prejudice the interests of the company or secure a monetary or other benefit to the Service Provider.

4.2 It is hereby expressly understood that the Company is entering into this Agreement based on the understanding that the information and documents provided by the Service Provider to the Company are correct, true and complete in all respects.

4.3 If it is discovered at any time in the future that the information and/ or documents provided by the Service Provider is or was incorrect, untrue or false in any material respect or of it is discovered that any material particulars or information has been deliberately withheld or suppressed, the Company shall be entitled to terminate the Services of the Service Provider forthwith.

4.4 The Service Provider shall at all times hereafter indemnify and keep the Company fully indemnified against all claims, demands, actions, proceedings, losses, damages, costs, charges, expenses, interests and disbursements of any nature whatsoever which the Company may pay or incur or suffer or sustain or be liable to pay as a result or consequence, direct or indirect, of any untrue, incorrect and/or misleading representations herein made by the Service Provider or of any breach by the Service Provider of the provisions hereof.

5. **INTELLECTUAL PROPERTY RIGHTS**

5.1 All information, inventions and discoveries, proprietary information or any interest in any copyright, patent and/or other property rights developed, made or conceived of by the Service Provider ("**Intellectual Property Rights**"), either alone or with others, at any time during the Service Provider's Services with the Company, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in, shall vest solely and exclusively with the Company.

5.2    The Service Provider shall have no right, title or interest whatsoever over the Intellectual Property Rights and shall not be entitled to use or exploit the same in any manner whatsoever.  Any and all Intellectual Property Rights that vest with the Service Provider under law in the course of his/her Services with the Company are hereby deemed to have been assigned and transferred in perpetuity to the Company for worldwide use for valid and adequate consideration.

5.3    It is understood that all Intellectual Property Rights created by the Service Provider in the course of his/her Services with the Company shall be "work made for hire" and in the event that any Intellectual Property Rights are not deemed "work made for hire", the Service Provider hereby irrevocably assigns in perpetuity for worldwide use by the Company, all his/her rights, title and interest in all such Intellectual Property Rights for valid and adequate consideration.

5.4    To the extent that any Intellectual Property Rights are not vesting with the Company in accordance with the provisions of Clauses 5.1 and 5.2 above, the Service Provider hereby irrevocably assigns in perpetuity for worldwide use to the Company, all his/her rights, title and interest with respect to the Intellectual Property Rights developed, made or conceived of by the Service Provider, either alone or with others, at any time during his/her Services with the Company and whether or not within working hours, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in.

5.5    The Service Provider hereby further undertake to sign all such agreements, deeds and documents as may be required under applicable laws to evidence the assignment of the Intellectual Property Rights to the Company.

## 6.    CONFIDENTIAL INFORMATION

6.1    The Service Provider shall not, without the prior written permission of the Company, directly or indirectly disclose or cause to be disclosed any information belonging to the Company ("**Confidential Information**") to any third party (other than the Service Providers of the Company who have a need to know such Confidential Information) and shall take all steps as may be reasonably necessary to protect the integrity of the Confidential Information and to ensure against any unauthorized disclosure thereof.  The Service Provider hereby further undertakes that the Service Provider shall use the Confidential Information only for the purpose for which it is provided and shall not profit from the same in any unauthorized manner whatsoever and shall promptly inform the Company of any potential or accidental disclosure of any Confidential Information and shall take all steps, together with the Company, to retrieve and protect the Confidential Information.

6.2    In the event of termination of the Service Provider's Services with the Company or if instructed by the Company at any time during the subsistence of his/her Services,

the Service Provider shall return to the Company (or upon instruction of the Company, destroy) all proprietary documents and Confidential Information and all copies thereof in his/her possession or under his/her control and the Service Provider hereby further acknowledges that the confidentiality obligation on his/her part as contained in Clause 6.1 above shall survive the termination of his/her Services with the Company.

6.3   The Service Provider further undertakes to execute such Confidentiality & Non-disclosure agreements, whether client specific or otherwise which the Company may require him/her to execute from time to time, in the format and in the manner to be stipulated by the Company.

## 7.   NON-COMPETE AND NON-SOLICITATION

7.1   During the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

(a)   carry on or engage in, directly or indirectly, whether through partnership or as a shareholder, joint venture partner, collaborator, consultant, Service Provider or agent or render services in any other manner whatsoever, whether for profit or otherwise any business which competes with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

(b)   render services or advice to any person or entity that is an existing client of the Company or that competes, directly or indirectly with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

7.2   During the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

(a)   attempt in any manner to solicit any clients of the Company, except on behalf of the Company, or to persuade any Person which is a client, present or future, of the Company to cease its association with the Company; or

(b)   employ engage or attempt to employ or engage anyone else to employ or engage, except on behalf of the Company, any Person who is or was at any time, in the Services of or engaged with the Company or renders any services to the Company,

7.3   The Service Provider agrees that the restrictions contained in this clause 7 are reasonable and necessary for the protection of the legitimate interests of the Company and its Affiliates and shall survive the termination of this Agreement. The Service Provider further acknowledges and agrees that the covenants and obligations

with respect to non-compete and non-solicitation as set forth above relate to special, unique and extraordinary matters, and that a violation of any of the terms of such covenants and obligations will cause the Company, its Affiliates and its customers' irreparable injury.

7.4     The Service Provider acknowledges that his/her compensation includes compensation for abiding by and adhering to the restrictions set out in this clause 7 and is a reasonable restriction to protect the legitimate interests of the Company, its affiliates and Customers.

7.5     The Service Provider is aware that any breach or non-observance or default of this Agreement by him/her ("Defaulting Party") will cause The Company ("Non-Defaulting Party") considerable damage and irreparable loss which, the Parties agree, are not capable of being remedied by damages and the Non-Defaulting Party shall therefore be entitled to obtain injunctive relief's to specifically enforce this Agreement and any other equitable relief appropriate for any threatened or actual breach of any such provision and no proof of special damages shall be necessary for the enforcement of the rights under this clause, which shall be in addition to any remedy the Non-Defaulting Party may have in law.

## 8.     TERMINATION

### 8.1    **By Resignation**

(a)     In the event the Service Provider seeks to terminate his/her Services with the Company without Reason, the Service Provider shall not be entitled to and shall not receive any compensation or benefits of any kind following the effective date of such termination.

Provided, however, that the Service Provider shall be entitled to receive any service fees earned but not yet paid and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

(b)     The Service Provider shall have the right to terminate his/her Services under the Agreement for Reason by giving to the Company 30 days' written notice thereof.

For the purposes of the Clause, the term **"Reason"** shall mean:

(i)      The Company's willful material breach of any provision of the Agreement; or

(ii)     Any material adverse change in the Service Provider's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities, or any other action by the Company made without the Service Provider's consent, which results in a diminution in any material respect of the Service Provider's position, authority, duties, responsibilities or compensation.

8.2    **Termination by the Company**

(a)    The Company may terminate the Service Provider's Services with the Company at any time by giving 30 days' written notice thereof.

(b)    The Company may forthwith and with immediate effect terminate the Service Provider's Services for Cause. If the Service Provider's Services is terminated for Cause, the Service Provider will not be entitled to and shall not receive any compensation of any kind following the effective date of termination of his/her Services.

(c)    Provided, however, that the Service Provider shall be entitled to receive any service due to paid to him/her and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

For the Purposes of the Clause, the term **"Cause"** shall mean:

(i)    Any act of dishonesty or other misconduct by the Service Provider during the performance of his/her duties under the Agreement that is detrimental to the pecuniary interests, reputation or goodwill of the Company or results in pecuniary gain to the Service Provider;

(ii)    Theft or misappropriation by the Service Provider of property of the Company or the commission of an act or acts by the Service Provider constituting fraud against the Company;

(iii)    The Service Provider's consistent failure to reasonably perform her Services duties as provided hereunder; or

(iv)    Willful misconduct or gross negligence in the performance of the Service Provider's duties.

8.3    Upon termination of the Service Provider's Services with the Company for any reason whatsoever, the Service Provider shall, not later than the date of termination:

(a)    surrender to the management of the Company or any other person/s nominated/ authorized by it, all originals and/or copies (whether in printed or electronic form) of business documents, legal documents, files, databases, blueprints, plans, projections, forecasts, charts, lists, reproductions or any data, tables, calculations, diaries, notes or books and correspondences or any other property, assets, monies or belongings of the Company or any subsidiary, associate, customer, affiliate or branch office of the Company, in the Service Provider's possession or control;

(b) execute a termination cum release Agreement in a format to be provided by the Company

## 9.    DISPUTE RESOLUTION AND GOVERNING LAW

9.1    This agreement shall be read and interpreted according to Indian law and courts at Mumbai shall have sole jurisdiction in respect of all matters pertaining to the Agreement.

9.2    The Agreement shall be governed and construed exclusively in accordance with the laws of India.

## 10.    MISCELLANEOUS

10.1    **Specific Performance and Injunctive Relief**

(a)    The Parties hereby acknowledge and agree that:

(i)    The Company will be irreparably injured in the event of a breach by the Service Provider of any of his/her obligations under provisions of this Agreement;

(ii)    monetary damages will not be an adequate remedy for any such breach;

(iii)    the Company will be entitled to injunctive relief, in addition to any other remedies that it may have, in the event of any such breach; and

(iv)    the existence of any claims that the Service Provider may have against the Company, whether under this Agreement or otherwise, shall not be a defense to the enforcement by the Company of any of its rights under the provisions of this Agreement.

(b)    The Company's rights to specific enforcement, injunctive relief and other remedies as set forth herein shall apply in the event of any breach or threatened breach by the Service Provider of any of the provisions of this Agreement.

**10**.2    **Reservation of Rights**

No forbearance, indulgence, relaxation or inaction by the Company at any time, to require performance of any of the provisions of the Agreement shall, in any way, affect, diminish or prejudice its right to require performance of that provision at a later point in time.

10.3    **Partial Invalidity**

If any provision of the Agreement is held to be invalid or unenforceable to any9999 extent, the remainder of the Agreement shall not be affected and each provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision of the Agreement shall be replaced with a provision, which is valid and enforceable and most nearly reflects the original intent of the unenforceable provision.

10.4  **Relationship**

None of the provisions of the Agreement shall be deemed to constitute a partnership between the Parties hereto and no party shall have any authority to bind the other party otherwise than under this Agreement.

10.5  **Entirety and Amendments**

The Agreement is the entire Agreement recording the understanding reached between the Parties in respect of the provisions contained in the Agreement. No modification or amendments to the Agreement and no waiver of any of the terms or conditions hereof shall be valid or binding unless made in writing and duly executed by the Parties.

**IN WITNESS WHEREOF THE PARTIES HERETO HAVE SET AND SUBSCRIBED THEIR RESPECTIVE HANDS TO THESE PRESENTS ON THE DAY, MONTH AND YEAR HEREINABOVE WRITTEN:**

SIGNED AND DELIVERED                                    )
By the within named **"Company"**                      )
through the hand of its authorized signatory   )
Mr. Neet Shah                                          )
In the presence of                                     )
_____                                  )


SIGNED AND DELIVERED                                    )
By the within named **"the Service Provider"** )
In the presence of                                     )
_____                            )

If any provision of the Agreement is held to be invalid or unenforceable to any9999 extent, the remainder of the Agreement shall not be affected and each provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision of the Agreement shall be replaced with a provision, which is valid and enforceable and most nearly reflects the original intent of the unenforceable provision.

## 10.4 Relationship

None of the provisions of the Agreement shall be deemed to constitute a partnership between the Parties hereto and no party shall have any authority to bind the other party otherwise than under this Agreement.

## 10.5 Entirety and Amendments

The Agreement is the entire Agreement recording the understanding reached between the Parties in respect of the provisions contained in the Agreement. No modification or amendments to the Agreement and no waiver of any of the terms or conditions hereof shall be valid or binding unless made in writing and duly executed by the Parties.

**IN WITNESS WHEREOF THE PARTIES HERETO HAVE SET AND SUBSCRIBED THEIR RESPECTIVE HANDS TO THESE PRESENTS ON THE DAY, MONTH AND YEAR HEREINABOVE WRITTEN:**

SIGNED AND DELIVERED                              )
By the within named **"Company"**                )
through the hand of its authorized signatory     )
Mr. Neet Shah                                    )
In the presence of                               )
                                                 )
_____

SIGNED AND DELIVERED                              )
By the within named **"the Service Provider"**   )
In the presence of                               )
_____ Mr. Rajesh Ranjan _____                )    April 8, 2019    ( Sachin Goel )

08/04/2019

Scanned by CamScanner

Exhibit C

## SERVICES AGREEMENT

The **Services Agreement** ("**Agreement**") is made on the 7th day of May, 2019 and effective from July 8, 2019 by and between:

**FischerJordan LLC**, a company incorporated under the laws of the state of New York and having its registered office at 125 Maiden Lane, Suite 307, New York, NY 10038, USA (hereinafter referred to as the **"Company"** which expression shall unless repugnant to the meaning or context thereof, be deemed to mean and include its successors and permitted assigns) of the **FIRST PART**

**AND**

**Ms. Archita Bhandari**, an adult Indian citizen presently residing at "314 Panchvati Colony, Airport Road, Lalghati, Bhopal, Madhya Pradesh 462032" (hereinafter referred to as **"the Service Provider"** which expression shall unless repugnant to the meaning or context thereof be deemed to mean and include her/his heirs, administrators, executors and legal representatives) of the **SECOND PART**

The Company and the Service Provider are collectively referred to as **"Parties"** and individually as **"Party"**

**WHEREAS**

A.      The Company is engaged *inter alia* in the business of management consultancy

B.      The Company now wishes to appoint the Service Provider to render certain services to the Company on the terms and conditions hereinafter appearing.

C.      In consideration of the mutual promises and agreements between the Parties hereto, the Parties have agreed to enter into this Agreement to govern the terms and conditions of Services.

**NOW THEEFORE IT IS HEREBY AGREED BY AND AMONGST THE PARTIES AS UNDER**:

1.      **APPOINTMENT AND TERM**

1.1     The Company has appointed the Service Provider on and from July 8, 2019 *("**Commencement date**")* in accordance with the terms and conditions of this Services Agreement.

1.2     Intentionally Left Blank

1.3   The Company may carry out such reference checks, verification of educational and other documents/certificates and medical examinations with respect to the Service Provider, as the Company may deem necessary and appropriate.

1.4   The Service Provider's Services with the Company shall continue till such time as the Agreement is terminated in accordance with Clause 8 herein below (**"Term"**).

2.   **SERVICES CONDITIONS**

2.1   The Service Provider shall fulfill such general duties and responsibilities as are assigned to him/her from time to time by the Board of Directors of the Company (**"Board"**)/senior management of the Company.

2.2   The Service Provider shall devote all of his/her business time, attention and energies to rendering the Services to the Company, and shall assume and perform such further reasonable responsibilities and duties as may be assigned or directed by the Board/senior management of the Company.

2.3   The Service Provider agrees that he/she will at all times while performing services for the Company, devote his/her best efforts, skill and ability and shall perform his/her responsibilities as a Service Provider of the Company in a competent ethical and professional manner.

2.4   The Service Provider agrees to abide by the rules, regulations, instructions, personnel policies and the policies of the Company and any change thereof, which may be adopted by the Company and intimated to the Service Provider from time to time.

2.5   The Service Provider's place of work shall be Mumbai, but he/she may be required to travel to any place within or outside India as directed by the Company, from time to time. All/any such travel shall be in accordance with the travel policy of the Company as maybe amended from time to time.

2.6   The Service Provider shall dedicate a minimum of 233 days per calendar year to rendering the Services to the Company.

2.7   The Company reserves the right to transfer the services of the Service Provider to any another department within the Company or to any other location or assign his/her Services to one of its affiliate entities on the same terms and conditions as this Agreement and the Service Provider hereby undertakes to have no objection to the same.

3.   **FEES & TAXES**

3.1  In consideration of the Services to be rendered by the Service Provider to the Company, the Company shall pay to the Service Provider a sum of **Rs. ▮▮▮▮▮ (Rupees Seventeen lakhs fifty thousand only) per annum**.

3.2  The consideration payable hereunder shall be paid on a monthly basis (in equal installments) on or before the 5th business day of the following month.

3.3  Additionally, the Service Provider will be eligible for annual performance bonuses that will be contingent on the Company's and the Service Provider's performance during the relevant evaluation period

3.4  Payments outlined in sections 3.1 and 3.3 will be conditional on completion of the services until the payment date, in their entirety, under the terms of this Agreement, and with neither party having served notice of termination of the agreement to the other party as of the payment date

3.5  All amounts payable to the Service Provider by the Company pursuant to his/her Services shall be subject to requisite tax and other statutory deductions in accordance with applicable laws.

3.6  Reimbursement of expenses: It is expressly agreed by the Parties that the Service Provider shall be entitled to reimbursement for such out of pocket expenses reasonably incurred by the Service Provider in the course of his Services including but not limited to travel, boarding and lodging which shall be reimbursed in accordance with the prevailing reimbursement policy of the Company, as maybe amended from time to time.  Provider must obtain the prior written approval of a Company Principal for any expenses over $100.

## 4.  REPRESENTATIONS AND WARRANTIES

4.1  The Service Provider hereby represents warrants and undertakes that:

(a)  The execution of the Agreement by him/her with the Company will not result in breach of any terms and conditions of any agreements or arrangements or infringe any statutory, contractual or other rights of any third parties, or constitute default under the laws of India or violate any rule, regulation or law of any government or any order, judgment or decree of any court or government body;

(b)  The Service Provider shall discharge the duties assigned to him/her in the course of his/her Services with greatest sincerity and diligence and shall at all times exercise his/her best efforts to protect and further the Company's interests;

(c) The Service Provider shall at all times during the subsistence of his/her Services, act in compliance with all applicable rules, regulations and policies of the Company and shall not indulge in any unethical behavior; and

(d) The Service Provider has not been convicted of any offence by any court of law and is not a party to any proceedings pending before or likely to be initiated before or by any court, tribunal, government agency or similar statutory body.

(e) The Service Provider does not have any conflict of interest arising from an independent relationship with suppliers, customers and other outside individuals and organizations associated with the Company, which could prejudice the interests of the company or secure a monetary or other benefit to the Service Provider.

4.2 It is hereby expressly understood that the Company is entering into this Agreement based on the understanding that the information and documents provided by the Service Provider to the Company are correct, true and complete in all respects.

4.3 If it is discovered at any time in the future that the information and/ or documents provided by the Service Provider is or was incorrect, untrue or false in any material respect or of it is discovered that any material particulars or information has been deliberately withheld or suppressed, the Company shall be entitled to terminate the Services of the Service Provider forthwith.

4.4 The Service Provider shall at all times hereafter indemnify and keep the Company fully indemnified against all claims, demands, actions, proceedings, losses, damages, costs, charges, expenses, interests and disbursements of any nature whatsoever which the Company may pay or incur or suffer or sustain or be liable to pay as a result or consequence, direct or indirect, of any untrue, incorrect and/or misleading representations herein made by the Service Provider or of any breach by the Service Provider of the provisions hereof.

## 5. INTELLECTUAL PROPERTY RIGHTS

5.1 All information, inventions and discoveries, proprietary information or any interest in any copyright, patent and/or other property rights developed, made or conceived of by the Service Provider ("**Intellectual Property Rights**"), either alone or with others, at any time during the Service Provider's Services with the Company, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in, shall vest solely and exclusively with the Company.

5.2 The Service Provider shall have no right, title or interest whatsoever over the Intellectual Property Rights and shall not be entitled to use or exploit the same in

any manner whatsoever.  Any and all Intellectual Property Rights that vest with the Service Provider under law in the course of his/her Services with the Company are hereby deemed to have been assigned and transferred in perpetuity to the Company for worldwide use for valid and adequate consideration.

5.3    It is understood that all Intellectual Property Rights created by the Service Provider in the course of his/her Services with the Company shall be "work made for hire" and in the event that any Intellectual Property Rights are not deemed "work made for hire", the Service Provider hereby irrevocably assigns in perpetuity for worldwide use by the Company, all his/her rights, title and interest in all such Intellectual Property Rights for valid and adequate consideration.

5.4    To the extent that any Intellectual Property Rights are not vesting with the Company in accordance with the provisions of Clauses 5.1 and 5.2 above, the Service Provider hereby irrevocably assigns in perpetuity for worldwide use to the Company, all his/her rights, title and interest with respect to the Intellectual Property Rights developed, made or conceived of by the Service Provider, either alone or with others, at any time during his/her Services with the Company and whether or not within working hours, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in.

5.5    The Service Provider hereby further undertake to sign all such agreements, deeds and documents as may be required under applicable laws to evidence the assignment of the Intellectual Property Rights to the Company.

## 6.    CONFIDENTIAL INFORMATION

6.1    The Service Provider shall not, without the prior written permission of the Company, directly or indirectly disclose or cause to be disclosed any information belonging to the Company ("**Confidential Information**") to any third party (other than the Service Providers of the Company who have a need to know such Confidential Information) and shall take all steps as may be reasonably necessary to protect the integrity of the Confidential Information and to ensure against any unauthorized disclosure thereof.  The Service Provider hereby further undertakes that the Service Provider shall use the Confidential Information only for the purpose for which it is provided and shall not profit from the same in any unauthorized manner whatsoever and shall promptly inform the Company of any potential or accidental disclosure of any Confidential Information and shall take all steps, together with the Company, to retrieve and protect the Confidential Information.

6.2    In the event of termination of the Service Provider's Services with the Company or if instructed by the Company at any time during the subsistence of his/her Services, the Service Provider shall return to the Company (or upon instruction of the Company, destroy) all proprietary documents and Confidential Information and all copies thereof in his/her possession or under his/her control and the Service

Provider hereby further acknowledges that the confidentiality obligation on his/her part as contained in Clause 6.1 above shall survive the termination of his/her Services with the Company.

6.3   The Service Provider further undertakes to execute such Confidentiality & Non-disclosure agreements, whether client specific or otherwise which the Company may require him/her to execute from time to time, in the format and in the manner to be stipulated by the Company.

## 7.   NON-COMPETE AND NON-SOLICITATION

7.1   During the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

(a)   carry on or engage in, directly or indirectly, whether through partnership or as a shareholder, joint venture partner, collaborator, consultant, Service Provider or agent or render services in any other manner whatsoever, whether for profit or otherwise any business which competes with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

(b)   render services or advice to any person or entity that is an existing client of the Company or that competes, directly or indirectly with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

7.2   During the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

(a)   attempt in any manner to solicit any clients of the Company, except on behalf of the Company, or to persuade any Person which is a client, present or future, of the Company to cease its association with the Company; or

(b)   employ engage or attempt to employ or engage anyone else to employ or engage, except on behalf of the Company, any Person who is or was at any time, in the Services of or engaged with the Company or renders any services to the Company,

7.3   The Service Provider agrees that the restrictions contained in this clause 7 are reasonable and necessary for the protection of the legitimate interests of the Company and its Affiliates and shall survive the termination of this Agreement. The Service Provider further acknowledges and agrees that the covenants and obligations with respect to non-compete and non-solicitation as set forth above relate to special, unique and extraordinary matters, and that a violation of any of the terms of such

covenants and obligations will cause the Company, its Affiliates and its customers' irreparable injury.

7.4    The Service Provider acknowledges that his/her compensation includes compensation for abiding by and adhering to the restrictions set out in this clause 7 and is a reasonable restriction to protect the legitimate interests of the Company, its affiliates and Customers.

7.5    The Service Provider is aware that any breach or non-observance or default of this Agreement by him/her ("Defaulting Party") will cause The Company ("Non-Defaulting Party") considerable damage and irreparable loss which, the Parties agree, are not capable of being remedied by damages and the Non-Defaulting Party shall therefore be entitled to obtain injunctive relief's to specifically enforce this Agreement and any other equitable relief appropriate for any threatened or actual breach of any such provision and no proof of special damages shall be necessary for the enforcement of the rights under this clause, which shall be in addition to any remedy the Non-Defaulting Party may have in law.

## 8.    TERMINATION

8.1    **By Resignation**

(a)    In the event the Service Provider seeks to terminate his/her Services with the Company without Reason, the Service Provider shall not be entitled to and shall not receive any compensation or benefits of any kind following the effective date of such termination.

Provided, however, that the Service Provider shall be entitled to receive any service fees earned but not yet paid and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

(b)    The Service Provider shall have the right to terminate his/her Services under the Agreement for Reason by giving to the Company 30 days' written notice thereof.

For the purposes of the Clause, the term **"Reason"** shall mean:

(i)    The Company's willful material breach of any provision of the Agreement; or

(ii)    Any material adverse change in the Service Provider's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities, or any other action by the Company made without the Service Provider's consent, which results in a diminution in any material respect of the Service Provider's position, authority, duties, responsibilities or compensation.

8.2    **Termination by the Company**

(a)    The Company may terminate the Service Provider's Services with the Company at any time by giving 30 days' written notice thereof.

(b)    The Company may forthwith and with immediate effect terminate the Service Provider's Services for Cause. If the Service Provider's Services is terminated for Cause, the Service Provider will not be entitled to and shall not receive any compensation of any kind following the effective date of termination of his/her Services.

(c)    Provided, however, that the Service Provider shall be entitled to receive any service due to paid to him/her and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

For the Purposes of the Clause, the term **"Cause"** shall mean:

(i)    Any act of dishonesty or other misconduct by the Service Provider during the performance of his/her duties under the Agreement that is detrimental to the pecuniary interests, reputation or goodwill of the Company or results in pecuniary gain to the Service Provider;

(ii)    Theft or misappropriation by the Service Provider of property of the Company or the commission of an act or acts by the Service Provider constituting fraud against the Company;

(iii)    The Service Provider's consistent failure to reasonably perform her Services duties as provided hereunder; or

(iv)    Willful misconduct or gross negligence in the performance of the Service Provider's duties.

8.3    Upon termination of the Service Provider's Services with the Company for any reason whatsoever, the Service Provider shall, not later than the date of termination:

(a)    surrender to the management of the Company or any other person/s nominated/ authorized by it, all originals and/or copies (whether in printed or electronic form) of business documents, legal documents, files, databases, blueprints, plans, projections, forecasts, charts, lists, reproductions or any data, tables, calculations, diaries, notes or books and correspondences or any other property, assets, monies or belongings of the Company or any subsidiary, associate, customer, affiliate or branch office of the Company, in the Service Provider's possession or control;

(b)    execute a termination cum release Agreement in a format to be provided by the Company

9.   **DISPUTE RESOLUTION AND GOVERNING LAW**

9.1   This agreement shall be read and interpreted according to Indian law and courts at Mumbai shall have sole jurisdiction in respect of all matters pertaining to the Agreement.

9.2   The Agreement shall be governed and construed exclusively in accordance with the laws of India.

10.   **MISCELLANEOUS**

10.1   **Specific Performance and Injunctive Relief**

(a)   The Parties hereby acknowledge and agree that:

   (i)     The Company will be irreparably injured in the event of a breach by the Service Provider of any of his/her obligations under provisions of this Agreement;

   (ii)    monetary damages will not be an adequate remedy for any such breach;

   (iii)   the Company will be entitled to injunctive relief, in addition to any other remedies that it may have, in the event of any such breach; and

   (iv)    the existence of any claims that the Service Provider may have against the Company, whether under this Agreement or otherwise, shall not be a defense to the enforcement by the Company of any of its rights under the provisions of this Agreement.

(b)   The Company's rights to specific enforcement, injunctive relief and other remedies as set forth herein shall apply in the event of any breach or threatened breach by the Service Provider of any of the provisions of this Agreement.

**10**.2   **Reservation of Rights**

   No forbearance, indulgence, relaxation or inaction by the Company at any time, to require performance of any of the provisions of the Agreement shall, in any way, affect, diminish or prejudice its right to require performance of that provision at a later point in time.

10.3   **Partial Invalidity**

If any provision of the Agreement is held to be invalid or unenforceable to any9999 extent, the remainder of the Agreement shall not be affected and each provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision of the Agreement shall be replaced with a

provision, which is valid and enforceable and most nearly reflects the original intent of the unenforceable provision.

10.4 **Relationship**

None of the provisions of the Agreement shall be deemed to constitute a partnership between the Parties hereto and no party shall have any authority to bind the other party otherwise than under this Agreement.

10.5 **Entirety and Amendments**

The Agreement is the entire Agreement recording the understanding reached between the Parties in respect of the provisions contained in the Agreement. No modification or amendments to the Agreement and no waiver of any of the terms or conditions hereof shall be valid or binding unless made in writing and duly executed by the Parties.

**IN WITNESS WHEREOF THE PARTIES HERETO HAVE SET AND SUBSCRIBED THEIR RESPECTIVE HANDS TO THESE PRESENTS ON THE DAY, MONTH AND YEAR HEREINABOVE WRITTEN:**

SIGNED AND DELIVERED                                         )
By the within named **"Company"**                           )
through the hand of its authorized signatory                )
Mr. Neet Shah                                               )
In the presence of                                          )
                                                            )

SIGNED AND DELIVERED                                         )
By the within named **"the Service Provider"**              )
In the presence of                                          )
Dharmendra Bhandari                                         )

Archita Bhandari

08-May-2019

Exhibit D

## SERVICES AGREEMENT

The **Services Agreement** (**"Agreement"**) is made on the 25th day of May, 2022 and effective from 1ˢᵗ July, 2022 by and between:

**FischerJordan LLC**, a company incorporated under the laws of the state of New York and having its registered office at 125 Maiden Lane, Suite 312, New York, NY 10038, USA (hereinafter referred to as the **"Company"** which expression shall unless repugnant to the meaning or context thereof, be deemed to mean and include its successors and permitted assigns) of the **FIRST PART**

### AND

**Kshitish Krit Nanda**, an adult Indian citizen presently residing at B 204, Satyam Tower, Bomikhal, Cuttack Road, Bhubaneshwar 751010, **India** (hereinafter referred to as **"the Service Provider"** which expression shall unless repugnant to the meaning or context thereof be deemed to mean and include her/his heirs, administrators, executors and legal representatives) of the **SECOND PART**

The Company and the Service Provider are collectively referred to as **"Parties"** and individually as **"Party"**

### WHEREAS

A.   The Company is engaged *inter alia* in the business of management consultancy

B.   The Company now wishes to appoint the Service Provider to render certain services to the Company on the terms and conditions hereinafter appearing.

C.   In consideration of the mutual promises and agreements between the Parties hereto, the Parties have agreed to enter into this Agreement to govern the terms and conditions of Services.

## NOW THEEFORE IT IS HEREBY AGREED BY AND AMONGST THE PARTIES AS UNDER:

### 1.   APPOINTMENT AND TERM

1.1   The Company has appointed the Service Provider on and from July 01, 2022 (*"Commencement date"*) in accordance with the terms and conditions of this Services Agreement.

1.2    Intentionally left blank

1.3    Prior to and after the Commencement Date, the Company shall carry out such reference checks, verification of educational and other documents/certificates and medical examinations with respect to the Service Provider, as the Company may deem necessary and appropriate. In the event that the Company is not satisfied by the results of the above, the Company may forthwith and with immediate effect terminate the Services of the Service Provider

1.4    Intentionally left blank

1.5    Intentionally left blank

1.6    The Service Provider's Services with the Company shall begin from the Commencement Date and shall continue for a period of three (3) years or until the Agreement is terminated in accordance with Clause 8 herein below ("**Term**").

## 2.    SERVICES CONDITIONS

2.1    The Service Provider shall fulfill such general duties and responsibilities as are assigned to him/her from time to time by the Board of Directors of the Company ("**Board**")/senior management of the Company.

2.2    The Service Provider shall devote all of his/her business time, attention and energies to rendering the Services to the Company, and shall assume and perform such further reasonable responsibilities and duties as may be assigned or directed by the Board/senior management of the Company.

2.3    The Service Provider agrees that he/she will at all times while performing services for the Company, devote his/her best efforts, skill and ability and shall perform his/her responsibilities as a Service Provider of the Company in a competent ethical and professional manner.

2.4    The Service Provider agrees to abide by the rules, regulations, instructions, personnel policies and the policies of the Company and any change thereof, which may be adopted by the Company and intimated to the Service Provider from time to time.

2.5    The Service Provider's place of work shall be Mumbai, but he/she may be required to travel to any place within or outside India as directed by the Company, from time to time. All/any such travel shall be in accordance with the travel policy of the Company as maybe amended from time to time.

2.6    The Service Provider shall dedicate a minimum of 240 days per calendar year to rendering the Services to the Company.

2.7    The Company reserves the right to transfer the services of the Service Provider to any another department within the Company or to any other location or assign his/her Services to one of its affiliate entities on the same terms and conditions as this Agreement and the Service Provider hereby undertakes to have no objection to the same.

2.8    The Company at its sole discretion will provide the Service Provider with an opportunity to visit United States of America upto a period of 2 (two) weeks after completing 2 (two) years of his/her Service with the Company and subject to Service Provider obtaining appropriate visa and documentation required to legally enter the United States of America.

## 3.    FEES & TAXES

3.1    In consideration of the Services to be rendered by the Service Provider to the Company, the Company shall pay to the Service Provider a Base Remuneration ("**Guaranteed Annual Base Remuneration**") as mentioned below **Remuneration**

| Period | Guaranteed Annual Base Remuneration (INR) |
|---|---|
| July 1, 2022 – June 30, 2023 | |
| July 1, 2023 – June 30, 2024 | |
| July 1, 2024 – June 30, 2025 | |

3.2    The Service Provider will further be eligible for a share of the Company's annual revenues as defined by actual cash receipts as mentioned hereinbelow:

| Period | % of Company Revenue (based on cash receipts) |
|---|---|
| July 1, 2022 – June 30, 2023 | |
| July 1, 2023 – June 30, 2024 | % |
| July 1, 2024 – June 30, 2025 | |

3.3    Intentionally left blank.

3.4    Save as provided in section 3.7 and 3.18 hereunder, the Company shall further pay to the Service Provider the following:

3

(a) Subject to section 3.6 below, a sum equivalent to Rs. ▮ (Rupees One lakh only), being a one time payment, payable upon the commencement of work under this Agreement ("**Signing Bonus**");

(b) A retention bonus, equivalent to Rs. ▮ (Rupees One lakh only), payable on December 31, 2022. The Service Provider shall also be eligible for additional retention bonus of Rs. ▮ (Rupees One lakh only) payable on June 30, 2025 ("**Retention Bonus**").

3.5    The Retention Bonus shall be payable to the Service Provider only during the subsistence of this Agreement at the time of payment of retention bonus.

3.6    The Company shall be entitled to clawback the Signing Bonus paid to the Service Provider in the event the Service Provider breaches the terms of the Agreement or the present Agreement is terminated before the end of the Term.

3.7    The Claw Back amount will be deducted from the last drawn Guaranteed Annual Base Remuneration of the Consultant as mentioned below:

| Service Provider Departure Period | Claw Back (in INR) |
|---|---|
| July 1, 2022 – June 30, 2023 | ▮ |
| July 1, 2023 – June 30, 2024 | ▮ |
| July 1, 2024 – June 30, 2025 | ▮ |

3.8    The consideration payable hereunder shall be paid on a monthly basis (in equal installments) on or before the 5th business day of the following month.

3.9    Intentionally left blank.

3.10    Additionally, the Service Provider will be eligible for annual performance bonus that will be contingent on the Company's and the Service Provider's performance during the relevant evaluation period. ("**Performance Based Bonus**")

3.11    The Performance Based Bonus shall be based on the annual review rating cycle commencing from 1st January of every year and ending on 31st December of every year.

3.12    The Company shall endeavor to disburse Performance Based Bonus within 30 days from the finalization of the annual review rating.

3.13    Payments outlined in sections 3.1, 3.2, 3.5 and 3.10 will be conditional on completion of the services until the payment date, in their entirety, under the terms of this Agreement,

and with neither party having served notice of termination of the agreement to the other party as of the payment date.

3.14 The Parties agree that the payments mentioned in section 3.2 and 3.10 shall be purely at discretion of Company and the Service Provider shall not raise any dispute/ grievance for non-payment of Performance Base Bonus.

3.15 The Service Provide will be required to have an account with either **HDFC Bank or IDFC Bank** in order to receive his payments from the Company.

3.16 All amounts payable to the Service Provider by the Company pursuant to his/her Services shall be subject to requisite tax and other statutory deductions in accordance with applicable laws.

3.17 Reimbursement of expenses: It is expressly agreed by the Parties that the Service Provider shall be entitled to reimbursement for such out of pocket expenses reasonably incurred by the Service Provider in the course of his Services including but not limited to travel, boarding and lodging which shall be reimbursed in accordance with the prevailing reimbursement policy of the Company, as maybe amended from time to time. Provider must obtain the prior written approval of a Company Principal for any expenses or if otherwise requested by Company.

3.18 Notwithstanding the other provisions of the Agreement, the entire amount of the Signing Bonus as the case may be, shall be payable by the Servicer Provider to the Company, immediately upon the occurrence of any of the events stated in section 3.7 above. The Service Provider shall be liable to make such refund within 30 days from the occurrence(s) of the event(s) described in section 3.7 above. Failure to refund within the stipulated timelines will result in the Service Provider being liable to pay interest at a rate of 18% p.a.

## 4. REPRESENTATIONS AND WARRANTIES

4.1 The Service Provider hereby represents warrants and undertakes that:

   (a) The execution of the Agreement by him/her with the Company will not result in breach of any terms and conditions of any agreements or arrangements or infringe any statutory, contractual or other rights of any third parties, or constitute default under the laws of India or violate any rule, regulation or law of any government or any order, judgment or decree of any court or government body;

5

(b)     The Service Provider shall discharge the duties assigned to him/her in the course of his/her Services with greatest sincerity and diligence and shall at all times exercise his/her best efforts to protect and further the Company's interests;

(c)     The Service Provider shall at all times during the subsistence of his/her Services, act in compliance with all applicable rules, regulations and policies of the Company and shall not indulge in any unethical behavior; and

(d)     The Service Provider has not been convicted of any offence by any court of law and is not a party to any proceedings pending before or likely to be initiated before or by any court, tribunal, government agency or similar statutory body.

(e)     The Service Provider does not have any conflict of interest arising from an independent relationship with suppliers, customers and other outside individuals and organizations associated with the Company, which could prejudice the interests of the company or secure a monetary or other benefit to the Service Provider.

4.2     It is hereby expressly understood that the Company is entering into this Agreement based on the understanding that the information and documents provided by the Service Provider to the Company are correct, true and complete in all respects.

4.3     If it is discovered at any time in the future that the information and/ or documents provided by the Service Provider is or was incorrect, untrue or false in any material respect or of it is discovered that any material particulars or information has been deliberately withheld or suppressed, the Company shall be entitled to terminate the Services of the Service Provider forthwith.

4.4     The Service Provider shall at all times hereafter indemnify and keep the Company fully indemnified against all claims, demands, actions, proceedings, losses, damages, costs, charges, expenses, interests and disbursements of any nature whatsoever which the Company may pay or incur or suffer or sustain or be liable to pay as a result or consequence, direct or indirect, of any untrue, incorrect and/or misleading representations herein made by the Service Provider or of any breach by the Service Provider of the provisions hereof.

6

## 5.    INTELLECTUAL PROPERTY RIGHTS

5.1    All information, inventions and discoveries, proprietary information or any interest in any copyright, patent and/or other property rights developed, made or conceived of by the Service Provider ("**Intellectual Property Rights**"), either alone or with others, at any time during the Service Provider's Services with the Company, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in, shall vest solely and exclusively with the Company.

5.2    The Service Provider shall have no right, title or interest whatsoever over the Intellectual Property Rights and shall not be entitled to use or exploit the same in any manner whatsoever. Any and all Intellectual Property Rights that vest with the Service Provider under law in the course of his/her Services with the Company are hereby deemed to have been assigned and transferred in perpetuity to the Company for worldwide use for valid and adequate consideration.

5.3    It is understood that all Intellectual Property Rights created by the Service Provider in the course of his/her Services with the Company shall be "work made for hire" and in the event that any Intellectual Property Rights are not deemed "work made for hire", the Service Provider hereby irrevocably assigns in perpetuity for worldwide use by the Company, all his/her rights, title and interest in all such Intellectual Property Rights for valid and adequate consideration.

5.4    To the extent that any Intellectual Property Rights are not vesting with the Company in accordance with the provisions of Clauses 5.1 and 5.2 above, the Service Provider hereby irrevocably assigns in perpetuity for worldwide use to the Company, all his/her rights, title and interest with respect to the Intellectual Property Rights developed, made or conceived of by the Service Provider, either alone or with others, at any time during his/her Services with the Company and whether or not within working hours, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in.

5.5    The Service Provider hereby further undertake to sign all such agreements, deeds and documents as may be required under applicable laws to evidence the assignment of the Intellectual Property Rights to the Company.

## 6.    CONFIDENTIAL INFORMATION

6.1 The Service Provider shall not, without the prior written permission of the Company, directly or indirectly disclose or cause to be disclosed any information belonging to the Company ("**Confidential Information**") to any third party (other than the Service Providers of the Company who have a need to know such Confidential Information) and shall take all steps as may be reasonably necessary to protect the integrity of the Confidential Information and to ensure against any unauthorized disclosure thereof. The Service Provider hereby further undertakes that the Service Provider shall use the Confidential Information only for the purpose for which it is provided and shall not profit from the same in any unauthorized manner whatsoever and shall promptly inform the Company of any potential or accidental disclosure of any Confidential Information and shall take all steps, together with the Company, to retrieve and protect the Confidential Information.

6.2 In the event of termination of the Service Provider's Services with the Company or if instructed by the Company at any time during the subsistence of his/her Services, the Service Provider shall return to the Company (or upon instruction of the Company, destroy) all proprietary documents and Confidential Information and all copies thereof in his/her possession or under his/her control and the Service Provider hereby further acknowledges that the confidentiality obligation on his/her part as contained in Clause 6.1 above shall survive the termination of his/her Services with the Company.

6.3 The Service Provider further undertakes to execute such Confidentiality & Non-disclosure agreements, whether client specific or otherwise which the Company may require him/her to execute from time to time, in the format and in the manner to be stipulated by the Company.

## 7.    NON-COMPETE AND NON-SOLICITATION

7.1 Notwithstanding any other agreements Company may have with its clients, during the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

  *(a)* carry on or engage in, directly or indirectly, whether through partnership or as a shareholder, joint venture partner, collaborator, consultant, Service Provider or agent or render services in any other manner whatsoever, whether for profit or otherwise any business which competes with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

    *(b)*    render services or advice to any person or entity that is an existing client of the Company or that competes, directly or indirectly with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

7.2    Notwithstanding any other agreements Company may have with its clients, during the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

    (a)    attempt in any manner to solicit any clients of the Company, except on behalf of the Company, or to persuade any Person which is a client, present or future, of the Company to cease its association with the Company; or

    (b)    employ engage or attempt to employ or engage anyone else to employ or engage, except on behalf of the Company, any Person who is or was at any time, in the Services of or engaged with the Company or renders any services to the Company,

7.3    The Service Provider agrees that the restrictions contained in this clause 7 are reasonable and necessary for the protection of the legitimate interests of the Company and its Affiliates and shall survive the termination of this Agreement. The Service Provider further acknowledges and agrees that the covenants and obligations with respect to non-compete and non-solicitation as set forth above relate to special, unique and extraordinary matters, and that a violation of any of the terms of such covenants and obligations will cause the Company, its Affiliates and its customers' irreparable injury.

7.4    The Service Provider acknowledges that his/her compensation includes compensation for abiding by and adhering to the restrictions set out in this clause 7 and is a reasonable restriction to protect the legitimate interests of the Company, its affiliates and Customers.

7.5    The Service Provider is aware that any breach or non-observance or default of this Agreement by him/her ("Defaulting Party") will cause The Company ("Non-Defaulting Party") considerable damage and irreparable loss which, the Parties agree, are not capable of being remedied by damages and the Non-Defaulting Party shall therefore be entitled to obtain injunctive relief's to specifically enforce this Agreement and any other equitable relief appropriate for any threatened or actual breach of any such provision and no proof of special damages shall be necessary for the enforcement of the rights under this clause, which shall be in addition to any remedy the Non-Defaulting Party may have in law.

8.    **TERMINATION**

8.1    **By Resignation**

(a)    In the event the Service Provider seeks to terminate his/her Services with the Company without Reason, the Service Provider shall not be entitled to and shall not receive any compensation or benefits of any kind following the effective date of such termination.

Provided, however, that the Service Provider shall be entitled to receive any service fees earned but not yet paid and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

(b)    The Service Provider shall have the right to terminate his/her Services under the Agreement for Reason by giving to the Company 90 days' written notice thereof ("**Notice Period**").

For the purposes of the Clause, the term "**Reason**" shall mean:

(i)    The Company's willful material breach of any provision of the Agreement; or

(ii)    Any material adverse change in the Service Provider's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities, or any other action by the Company made without the Service Provider's consent, which results in a diminution in any material respect of the Service Provider's position, authority, duties, responsibilities or compensation.

(c)    If the Service Provider wishes to terminate the Contract prior to the expiry of the Term, the Service Provider shall be liable to pay Early Termination Fees as enumerated hereinbelow:

| Sr No | Period of Resignation | Early Termination Fees |
|-------|----------------------|------------------------|
| 1.    | July 01, 2022 – June 30, 2023 | 2 months of Annual Base Remuneration |
| 2.    | July 01, 2023 – June 30, 2024 | 1 month of Annual Base Remuneration |
| 3.    | July 01, 2024 – June 30, 2025 | 15 days of Annual Base Remuneration |

(d) The Service Provider shall have an option, subject to the confirmation and acceptance by the Company, to give a shorter Notice Period provided the Service Provider pays to the Company the "**Shortened Notice Period Fees**" as enumerated hereinbelow:

| Sr No. | Period of Resignation | Shortened Notice Period Fees |
|--------|----------------------|------------------------------|
| 1. | 0-30 days | 3 months of Annual Base Remuneration |
| 2. | 31-60 days | 2 months of Annual Base Remuneration |
| 3. | 61-90 days | 1 month of Annual Base Remuneration |

## 8.2 Termination by the Company

(a) The Company may terminate the Service Provider's Services with the Company at any time by giving 90 days' written notice thereof.

(b) The Company may forthwith and with immediate effect terminate the Service Provider's Services for Cause. If the Service Provider's Services is terminated for Cause, the Service Provider will not be entitled to and shall not receive any compensation of any kind following the effective date of termination of his/her Services.

(c) Provided, however, that the Service Provider shall be entitled to receive any service due to paid to him/her and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

For the Purposes of the Clause, the term "**Cause**" shall mean:

    (i) Any act of dishonesty or other misconduct by the Service Provider during the performance of his/her duties under the Agreement that is detrimental to the pecuniary interests, reputation or goodwill of the Company or results in pecuniary gain to the Service Provider;

    (ii) Theft or misappropriation by the Service Provider of property of the Company or the commission of an act or acts by the Service Provider constituting fraud against the Company;

    (iii) The Service Provider's consistent failure to reasonably perform her Services duties as provided hereunder; or

(iv)    Willful misconduct or gross negligence in the performance of the Service Provider's duties.

8.3    Upon termination of the Service Provider's Services with the Company for any reason whatsoever, the Service Provider shall, not later than the date of termination:

(a)    surrender to the management of the Company or any other person/s nominated/ authorized by it, all originals and/or copies (whether in printed or electronic form) of business documents, legal documents, files, databases, blueprints, plans, projections, forecasts, charts, lists, reproductions or any data, tables, calculations, diaries, notes or books and correspondences or any other property, assets, monies or belongings of the Company or any subsidiary, associate, customer, affiliate or branch office of the Company, in the Service Provider's possession or control;

(b)    execute a termination cum release Agreement in a format to be provided by the Company

# 9.    DISPUTE RESOLUTION AND GOVERNING LAW

9.1    This agreement shall be read and interpreted according to Indian law and courts at Mumbai shall have sole jurisdiction in respect of all matters pertaining to the Agreement.

9.2    The Agreement shall be governed and construed exclusively in accordance with the laws of India.

# 10.    MISCELLANEOUS

## 10.1    Specific Performance and Injunctive Relief

(a)    The Parties hereby acknowledge and agree that:

(i)    The Company will be irreparably injured in the event of a breach by the Service Provider of any of his/her obligations under provisions of this Agreement;

(ii)    monetary damages will not be an adequate remedy for any such breach;

(iii)   the Company will be entitled to injunctive relief, in addition to any other remedies that it may have, in the event of any such breach; and

(iv)   the existence of any claims that the Service Provider may have against the Company, whether under this Agreement or otherwise, shall not be a defense to the enforcement by the Company of any of its rights under the provisions of this Agreement.

(b)   The Company's rights to specific enforcement, injunctive relief and other remedies as set forth herein shall apply in the event of any breach or threatened breach by the Service Provider of any of the provisions of this Agreement.

## 10.2  Reservation of Rights

No forbearance, indulgence, relaxation or inaction by the Company at any time, to require performance of any of the provisions of the Agreement shall, in any way, affect, diminish or prejudice its right to require performance of that provision at a later point in time.

## 10.3  Partial Invalidity

If any provision of the Agreement is held to be invalid or unenforceable to any9999 extent, the remainder of the Agreement shall not be affected and each provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision of the Agreement shall be replaced with a provision, which is valid and enforceable and most nearly reflects the original intent of the unenforceable provision.

## 10.4  Relationship

None of the provisions of the Agreement shall be deemed to constitute a partnership between the Parties hereto and no party shall have any authority to bind the other party otherwise than under this Agreement.

## 10.5  Entirety and Amendments

The Agreement is the entire Agreement recording the understanding reached between the Parties in respect of the provisions contained in the Agreement. No modification or amendments to the Agreement and no waiver of any of the terms

or conditions hereof shall be valid or binding unless made in writing and duly executed by the Parties.

IN WITNESS WHEREOF THE PARTIES HERETO HAVE SET AND SUBSCRIBED THEIR RESPECTIVE HANDS TO THESE PRESENTS ON THE DAY, MONTH AND YEAR HEREINABOVE WRITTEN:

SIGNED AND DELIVERED )
By the within named "**Company**" )
through the hand of its authorized signatory )
Mr. Neet Shah )
In the presence of )
_____ )

SIGNED AND DELIVERED )
By the within named "**the Service Provider**" )
In the presence of )
_____ )

Kshitish Krit Nanda
20|11|2022

# Exhibit E

## SERVICES AGREEMENT

The **Services Agreement** ("**Agreement**") is made on the 1ˢᵗ day of January 2023 and effective from 1ˢᵗ January 2023 by and between:

**FischerJordan LLC**, a company incorporated under the laws of the state of New York and having its registered office at 385 5ᵗʰ Ave Ste., 1108, New York, NY 10016, USA (hereinafter referred to as the **"Company"** which expression shall unless repugnant to the meaning or context thereof, be deemed to mean and include its successors and permitted assigns) of the **FIRST PART**

**AND**

**Ankush Gupta**, an adult Indian citizen presently residing **2/34 DDA Flats Garhi, East of Kailash, New Delhi-110065, India** (hereinafter referred to as **"the Service Provider"** which expression shall unless repugnant to the meaning or context thereof be deemed to mean and include her/his heirs, administrators, executors and legal representatives) of the **SECOND PART**

The Company and the Service Provider are collectively referred to as **"Parties"** and individually as **"Party"**

**WHEREAS**

A.    The Company is engaged *inter alia* in the business of management consultancy

B.    The Company now wishes to appoint the Service Provider to render certain services to the Company on the terms and conditions hereinafter appearing.

C.    In consideration of the mutual promises and agreements between the Parties hereto, the Parties have agreed to enter into this Agreement to govern the terms and conditions of Services.

**NOW THEEFORE IT IS HEREBY AGREED BY AND AMONGST THE PARTIES AS UNDER**:

1.    **APPOINTMENT AND TERM**

1.1   The Company has appointed the Service Provider on and from January 01, 2023 *("*Commencement date*")* in accordance with the terms and conditions of this Services Agreement.

1.2 Intentionally left blank

1.3 Prior to and after the Commencement Date, the Company shall carry out such reference checks, verification of educational and other documents/certificates and medical examinations with respect to the Service Provider, as the Company may deem necessary and appropriate. In the event that the Company is not satisfied by the results of the above, the Company may forthwith and with immediate effect terminate the Services of the Service Provider

1.4 Intentionally left blank

1.5 Intentionally left blank

1.6 The Service Provider's Services with the Company shall begin from the Commencement Date and shall continue for a period of three (3) years or until the Agreement is terminated in accordance with Clause 8 herein below ("**Term**").

2. **SERVICES CONDITIONS**

2.1 The Service Provider shall fulfill such general duties and responsibilities as are assigned to him/her from time to time by the Board of Directors of the Company ("**Board**")/senior management of the Company.

2.2 The Service Provider shall devote all of his/her business time, attention and energies to rendering the Services to the Company, and shall assume and perform such further reasonable responsibilities and duties as may be assigned or directed by the Board/senior management of the Company.

2.3 The Service Provider agrees that he/she will at all times while performing services for the Company, devote his/her best efforts, skill and ability and shall perform his/her responsibilities as a Service Provider of the Company in a competent ethical and professional manner.

2.4 The Service Provider agrees to abide by the rules, regulations, instructions, personnel policies and the policies of the Company and any change thereof, which may be adopted by the Company and intimated to the Service Provider from time to time.

2.5 The Service Provider's place of work shall be Mumbai, but he/she may be required to travel to any place within or outside India as directed by the Company, from time

to time. All/any such travel shall be in accordance with the travel policy of the Company as maybe amended from time to time.

2.6    The Service Provider shall dedicate a minimum of 240 days per calendar year to rendering the Services to the Company.

2.7    The Company reserves the right to transfer the services of the Service Provider to any another department within the Company or to any other location or assign his/her Services to one of its affiliate entities on the same terms and conditions as this Agreement and the Service Provider hereby undertakes to have no objection to the same.

2.8    The Company at its sole discretion will provide the Service Provider with an opportunity to visit United States of America upto a period of 2 (two) weeks after completing 2 (two) years of his/her Service with the Company and subject to Service Provider obtaining appropriate visa and documentation required to legally enter the United States of America.

3.    **FEES & TAXES**

3.1    In consideration of the Services to be rendered by the Service Provider to the Company, the Company shall pay to the Service Provider a Base Remuneration ("**Guaranteed Annual Base Remuneration**") as mentioned below. The consideration payable hereunder shall be paid on a monthly basis (in equal installments) on or before the 5th business day of the following month.

| Period | Guaranteed Annual Base Remuneration (INR) |
|---|---|
| Jan 1, 2023 – Dec 31, 2023 | ███████/- |
| Jan 1, 2024 – Dec 31, 2024 | ███████/- |
| Jan 1, 2025 – Dec 31, 2025 | ███████/- |

3.2    The Service Provider will further be eligible for a share of the Company's annual revenues as defined by actual cash receipts as mentioned hereinbelow:

| Period | % of Company Revenue (based on cash receipts) |
|---|---|
| Jan 1, 2023 – Dec 31, 2023 | ███% |
| Jan 1, 2024 – Dec 31, 2024 | ███% |
| Jan 1, 2025 – Dec 31, 2025 | ███% |

3.3    Intentionally left blank.

3.4     Save as provided in section 3.18 hereunder, the Company shall further pay to the Service Provider the following:

(a)     Subject to section 3.6 below, a sum equivalent to Rs.█████ (Rupees One lakh only), being a one-time payment, payable upon the commencement of work under this Agreement ("**Signing Bonus**");

(b)     A retention bonus, equivalent to Rs.█████ (Rupees One lakh only), payable on January 1, 2026. ("**Retention Bonus**").

3.5     The Retention Bonus shall be payable to the Service Provider only during the subsistence of this Agreement at the time of payment of retention bonus.

3.6     The Company shall be entitled to clawback the Signing Bonus paid to the Service Provider in the event the Service Provider breaches the terms of the Agreement or the present Agreement is terminated before the end of the Term.

3.7     Intentionally left blank

3.8     Intentionally left blank

3.9     Intentionally left blank.

3.10    Additionally, the Service Provider will be eligible for annual performance bonus that will be contingent on the Company's and the Service Provider's performance during the relevant evaluation period. ("**Performance Based Bonus**")

3.11    The Performance Based Bonus shall be based on the annual review rating cycle commencing from 1st January of every year and ending on 31st December of every year.

3.12    The Company shall endeavor to disburse Performance Based Bonus within 30 days from the finalization of the annual review rating.

3.13    Payments outlined in sections 3.1, 3.2, 3.4 and 3.10 will be conditional on completion of the services until the payment date, in their entirety, under the terms of this Agreement, and with neither party having served notice of termination of the agreement to the other party as of the payment date.

3.14    The Parties agree that the payments mentioned in section 3.2 and 3.10 shall be purely at discretion of Company and the Service Provider shall not raise any dispute/ grievance for non-payment of Performance Base Bonus.

3.15    The Service Provide will be required to have an account with either **HDFC Bank or IDFC Bank** in order to receive his payments from the Company.

3.16    All amounts payable to the Service Provider by the Company pursuant to his/her Services shall be subject to requisite tax and other statutory deductions in accordance with applicable laws.

3.17    Reimbursement of expenses: It is expressly agreed by the Parties that the Service Provider shall be entitled to reimbursement for such out of pocket expenses reasonably incurred by the Service Provider in the course of his Services including but not limited to travel, boarding and lodging which shall be reimbursed in accordance with the prevailing reimbursement policy of the Company, as maybe amended from time to time.  Provider must obtain the prior written approval of a Company Principal for any expenses or if otherwise requested by Company.

3.18    Notwithstanding the other provisions of the Agreement, the entire amount of the Signing Bonus as the case may be, shall be payable by the Servicer Provider to the Company, immediately upon the occurrence of any of the events stated in section 3.6 above.  The Service Provider shall be liable to make such refund within 30 days from the occurrence(s) of the event(s) described in section 3.6 above.  Failure to refund within the stipulated timelines will result in the Service Provider being liable to pay interest at a rate of 18% p.a.

4.    **REPRESENTATIONS AND WARRANTIES**

4.1    The Service Provider hereby represents warrants and undertakes that:

(a)    The execution of the Agreement by him/her with the Company will not result in breach of any terms and conditions of any agreements or arrangements or infringe any statutory, contractual or other rights of any third parties, or constitute default under the laws of India or violate any rule, regulation or law of any government or any order, judgment or decree of any court or government body;

(b)    The Service Provider shall discharge the duties assigned to him/her in the course of his/her Services with greatest sincerity and diligence and shall at all times exercise his/her best efforts to protect and further the Company's interests;

(c)    The Service Provider shall at all times during the subsistence of his/her Services, act in compliance with all applicable rules, regulations and policies of the Company and shall not indulge in any unethical behavior; and

(d)    The Service Provider has not been convicted of any offence by any court of law and is not a party to any proceedings pending before or likely to be initiated before or by any court, tribunal, government agency or similar statutory body.

(e)    The Service Provider does not have any conflict of interest arising from an independent relationship with suppliers, customers and other outside individuals and organizations associated with the Company, which could prejudice the interests of the company or secure a monetary or other benefit to the Service Provider.

4.2    It is hereby expressly understood that the Company is entering into this Agreement based on the understanding that the information and documents provided by the Service Provider to the Company are correct, true and complete in all respects.

4.3    If it is discovered at any time in the future that the information and/ or documents provided by the Service Provider is or was incorrect, untrue or false in any material respect or of it is discovered that any material particulars or information has been deliberately withheld or suppressed, the Company shall be entitled to terminate the Services of the Service Provider forthwith.

4.4    The Service Provider shall at all times hereafter indemnify and keep the Company fully indemnified against all claims, demands, actions, proceedings, losses, damages, costs, charges, expenses, interests and disbursements of any nature whatsoever which the Company may pay or incur or suffer or sustain or be liable to pay as a result or consequence, direct or indirect, of any untrue, incorrect and/or misleading representations herein made by the Service Provider or of any breach by the Service Provider of the provisions hereof.

## 5.    INTELLECTUAL PROPERTY RIGHTS

5.1    All information, inventions and discoveries, proprietary information or any interest in any copyright, patent and/or other property rights developed, made or conceived of by the Service Provider ("**Intellectual Property Rights**"), either alone or with others, at any time during the Service Provider's Services with the Company, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in, shall vest solely and exclusively with the Company.

5.2    The Service Provider shall have no right, title or interest whatsoever over the Intellectual Property Rights and shall not be entitled to use or exploit the same in any manner whatsoever.  Any and all Intellectual Property Rights that vest with the Service Provider under law in the course of his/her Services with the Company are hereby deemed to have been assigned and transferred in perpetuity to the Company for worldwide use for valid and adequate consideration.

5.3    It is understood that all Intellectual Property Rights created by the Service Provider in the course of his/her Services with the Company shall be "work made for hire" and in the event that any Intellectual Property Rights are not deemed "work made for hire", the Service Provider hereby irrevocably assigns in perpetuity for worldwide use by the Company, all his/her rights, title and interest in all such Intellectual Property Rights for valid and adequate consideration.

5.4    To the extent that any Intellectual Property Rights are not vesting with the Company in accordance with the provisions of Clauses 5.1 and 5.2 above, the Service Provider hereby irrevocably assigns in perpetuity for worldwide use to the Company, all his/her rights, title and interest with respect to the Intellectual Property Rights developed, made or conceived of by the Service Provider, either alone or with others, at any time during his/her Services with the Company and whether or not within working hours, arising out of such Services or pertinent to any field of business or research in which, during such Services, the Company is engaged in.

5.5    The Service Provider hereby further undertake to sign all such agreements, deeds and documents as may be required under applicable laws to evidence the assignment of the Intellectual Property Rights to the Company.

## 6.    CONFIDENTIAL INFORMATION

6.1    The Service Provider shall not, without the prior written permission of the Company, directly or indirectly disclose or cause to be disclosed any information belonging to the Company ("**Confidential Information**") to any third party (other than the Service Providers of the Company who have a need to know such Confidential Information) and shall take all steps as may be reasonably necessary to protect the integrity of the Confidential Information and to ensure against any unauthorized disclosure thereof.  The Service Provider hereby further undertakes that the Service Provider shall use the Confidential Information only for the purpose for which it is provided and shall not profit from the same in any unauthorized manner whatsoever and shall promptly inform the Company of any potential or accidental disclosure of any Confidential Information and shall take all steps, together with the Company, to retrieve and protect the Confidential Information.

6.2   In the event of termination of the Service Provider's Services with the Company or if instructed by the Company at any time during the subsistence of his/her Services, the Service Provider shall return to the Company (or upon instruction of the Company, destroy) all proprietary documents and Confidential Information and all copies thereof in his/her possession or under his/her control and the Service Provider hereby further acknowledges that the confidentiality obligation on his/her part as contained in Clause 6.1 above shall survive the termination of his/her Services with the Company.

6.3   The Service Provider further undertakes to execute such Confidentiality & Non-disclosure agreements, whether client specific or otherwise which the Company may require him/her to execute from time to time, in the format and in the manner to be stipulated by the Company.

## 7.    NON-COMPETE AND NON-SOLICITATION

7.1   Notwithstanding any other agreements Company may have with its clients, during the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

(a)   carry on or engage in, directly or indirectly, whether through partnership or as a shareholder, joint venture partner, collaborator, consultant, Service Provider or agent or render services in any other manner whatsoever, whether for profit or otherwise any business which competes with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

(b)   render services or advice to any person or entity that is an existing client of the Company or that competes, directly or indirectly with the whole or any part of the business of the Company and/or its Affiliates within India or the United States of America.

7.2   Notwithstanding any other agreements Company may have with its clients, during the subsistence of this Agreement and for a period of 18 (eighteen) months thereafter, the Service Provider expressly agrees and undertakes not to:

(a)   attempt in any manner to solicit any clients of the Company, except on behalf of the Company, or to persuade any Person which is a client, present or future, of the Company to cease its association with the Company; or

(b)     employ engage or attempt to employ or engage anyone else to employ or engage, except on behalf of the Company, any Person who is or was at any time, in the Services of or engaged with the Company or renders any services to the Company,

7.3     The Service Provider agrees that the restrictions contained in this clause 7 are reasonable and necessary for the protection of the legitimate interests of the Company and its Affiliates and shall survive the termination of this Agreement. The Service Provider further acknowledges and agrees that the covenants and obligations with respect to non-compete and non-solicitation as set forth above relate to special, unique and extraordinary matters, and that a violation of any of the terms of such covenants and obligations will cause the Company, its Affiliates and its customers' irreparable injury.

7.4     The Service Provider acknowledges that his/her compensation includes compensation for abiding by and adhering to the restrictions set out in this clause 7 and is a reasonable restriction to protect the legitimate interests of the Company, its affiliates and Customers.

7.5     The Service Provider is aware that any breach or non-observance or default of this Agreement by him/her ("Defaulting Party") will cause The Company ("Non-Defaulting Party") considerable damage and irreparable loss which, the Parties agree, are not capable of being remedied by damages and the Non-Defaulting Party shall therefore be entitled to obtain injunctive relief's to specifically enforce this Agreement and any other equitable relief appropriate for any threatened or actual breach of any such provision and no proof of special damages shall be necessary for the enforcement of the rights under this clause, which shall be in addition to any remedy the Non-Defaulting Party may have in law.

## 8.     TERMINATION

### 8.1    By Resignation

(a)     In the event the Service Provider seeks to terminate his/her Services with the Company without Reason, the Service Provider shall not be entitled to and shall not receive any compensation or benefits of any kind following the effective date of such termination.

Provided, however, that the Service Provider shall be entitled to receive any service fees earned but not yet paid and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

(b)    The Service Provider shall have the right to terminate his/her Services under the Agreement for Reason by giving to the Company 90 days' written notice thereof ("**Notice Period**").

For the purposes of the Clause, the term **"Reason"** shall mean:

(i)    The Company's willful material breach of any provision of the Agreement; or

(ii)    Any material adverse change in the Service Provider's position (including status, offices, titles and reporting requirements), authority, duties or responsibilities, or any other action by the Company made without the Service Provider's consent, which results in a diminution in any material respect of the Service Provider's position, authority, duties, responsibilities or compensation.

(c)    If the Service Provider wishes to terminate the Contract prior to the expiry of the Term, the Service Provider shall be liable to pay Early Termination Fees as enumerated hereinbelow:

| Sr No. | Period of Resignation | Early Termination Fees |
|---|---|---|
| 1. | Jan 1, 2023 – Dec 31, 2023 | **3 months of Annual Base Remuneration** |
| 2. | Jan 1, 2024 – Dec 31, 2024 | **2 month of Annual Base Remuneration** |
| 3. | Jan 1, 2025 – Dec 31, 2025 | **1 month of Annual Base Remuneration** |

(d)    The Service Provider shall have an option, subject to the confirmation and acceptance by the Company, to give a shorter Notice Period provided the Service Provider pays to the Company the "**Shortened Notice Period Fees**" as enumerated hereinbelow:

| Sr No. | Notice Period | Shortened Notice Period Fees |
|---|---|---|
| 1. | 0-30 days | **3 months of Annual Base Remuneration** |
| 2. | 31-60 days | **2 months of Annual Base Remuneration** |
| 3. | 61-90 days | **1 month of Annual Base Remuneration** |

8.2    **Termination by the Company**

(a)    The Company may terminate the Service Provider's Services with the Company at any time by giving 90 days' written notice thereof.

(b)    The Company may forthwith and with immediate effect terminate the Service Provider's Services for Cause. If the Service Provider's Services is terminated for

Cause, the Service Provider will not be entitled to and shall not receive any compensation of any kind following the effective date of termination of his/her Services.

(c)     Provided, however, that the Service Provider shall be entitled to receive any service due to paid to him/her and any reimbursable expenses incurred but not yet paid, as of the effective date of such termination.

For the Purposes of the Clause, the term **"Cause"** shall mean:

(i)     Any act of dishonesty or other misconduct by the Service Provider during the performance of his/her duties under the Agreement that is detrimental to the pecuniary interests, reputation or goodwill of the Company or results in pecuniary gain to the Service Provider;

(ii)    Theft or misappropriation by the Service Provider of property of the Company or the commission of an act or acts by the Service Provider constituting fraud against the Company;

(iii)   The Service Provider's consistent failure to reasonably perform her Services duties as provided hereunder; or

(iv)    Willful misconduct or gross negligence in the performance of the Service Provider's duties.

8.3     Upon termination of the Service Provider's Services with the Company for any reason whatsoever, the Service Provider shall, not later than the date of termination:

(a) surrender to the management of the Company or any other person/s nominated/ authorized by it, all originals and/or copies (whether in printed or electronic form) of business documents, legal documents, files, databases, blueprints, plans, projections, forecasts, charts, lists, reproductions or any data, tables, calculations, diaries, notes or books and correspondences or any other property, assets, monies or belongings of the Company or any subsidiary, associate, customer, affiliate or branch office of the Company, in the Service Provider's possession or control;

(b) execute a termination cum release Agreement in a format to be provided by the Company

9.      **DISPUTE RESOLUTION AND GOVERNING LAW**

9.1    This agreement shall be read and interpreted according to Indian law and courts at Mumbai shall have sole jurisdiction in respect of all matters pertaining to the Agreement.

9.2    The Agreement shall be governed and construed exclusively in accordance with the laws of India.

10.    **MISCELLANEOUS**

10.1    **Specific Performance and Injunctive Relief**

(a)    The Parties hereby acknowledge and agree that:

    (i)    The Company will be irreparably injured in the event of a breach by the Service Provider of any of his/her obligations under provisions of this Agreement;

    (ii)    monetary damages will not be an adequate remedy for any such breach;

    (iii)    the Company will be entitled to injunctive relief, in addition to any other remedies that it may have, in the event of any such breach; and

    (iv)    the existence of any claims that the Service Provider may have against the Company, whether under this Agreement or otherwise, shall not be a defense to the enforcement by the Company of any of its rights under the provisions of this Agreement.

(b)    The Company's rights to specific enforcement, injunctive relief and other remedies as set forth herein shall apply in the event of any breach or threatened breach by the Service Provider of any of the provisions of this Agreement.

**10**.2    **Reservation of Rights**

No forbearance, indulgence, relaxation or inaction by the Company at any time, to require performance of any of the provisions of the Agreement shall, in any way, affect, diminish or prejudice its right to require performance of that provision at a later point in time.

10.3  **Partial Invalidity**

If any provision of the Agreement is held to be invalid or unenforceable to any9999 extent, the remainder of the Agreement shall not be affected and each provision of the Agreement shall be valid and enforceable to the fullest extent permitted by law. Any invalid or unenforceable provision of the Agreement shall be replaced with a provision, which is valid and enforceable and most nearly reflects the original intent of the unenforceable provision.

10.4  **Relationship**

None of the provisions of the Agreement shall be deemed to constitute a partnership between the Parties hereto and no party shall have any authority to bind the other party otherwise than under this Agreement.

10.5  **Entirety and Amendments**

The Agreement is the entire Agreement recording the understanding reached between the Parties in respect of the provisions contained in the Agreement. No modification or amendments to the Agreement and no waiver of any of the terms or conditions hereof shall be valid or binding unless made in writing and duly executed by the Parties.

**IN WITNESS WHEREOF THE PARTIES HERETO HAVE SET AND SUBSCRIBED THEIR RESPECTIVE HANDS TO THESE PRESENTS ON THE DAY, MONTH AND YEAR HEREINABOVE WRITTEN:**

SIGNED AND DELIVERED                                        )

By the within named **"Company"**                           )

through the hand of its authorized signatory    )

Mr. Neet Shah                                                       )


SIGNED AND DELIVERED                                        )

By the within named **"the Service Provider"** )